# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### November 18, 2014 Session

## STATE OF TENNESSEE v. GEORGE GEOVONNI THOMAS

**Appeal from the Criminal Court for Knox County**
No. 86216C      Walter Kurtz, Judge

No. E2013-01738-CCA-R3-CD **- Filed February 5, 2015**

A Knox County jury found the Defendant, George Geovonni Thomas, guilty of thirty-eight criminal charges, including first degree murder, aggravated rape, especially aggravated robbery, and especially aggravated kidnapping. The jury imposed sentences of life in prison for the first-degree murder convictions. The trial court imposed sentences for the remaining convictions for an effective sentence of two consecutive life sentences plus twenty-five years in the Tennessee Department of Correction. The Defendant appeals asserting that: (1) the trial court erred when it denied his motion to suppress his statements; (2) the trial court improperly admitted an "unreliable unrecorded statement attributed by law enforcement to [the Defendant];" (3) the criminal responsibility statute is void for vagueness; (4) the trial court erred when it retroactively applied the *Dorantes* evidentiary standard pertaining to circumstantial evidence; (5) the presentment was insufficient for failure to charge criminal responsibility; and (6) the evidence is insufficient to sustain his convictions. After a thorough review of the record and applicable authorities, we affirm the trial court's judgments.

**Tenn. R. App. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and TIMOTHY L. EASTER, JJ., joined.

W. Thomas Dillard and Stephen Ross Johnson, Knoxville, Tennessee, for the appellant, George Geovonni Thomas.

Herbert H. Slatery, III, Attorney General and Reporter; Deshea Dulany Faughn, Senior Counsel; Charme Allen, District Attorney General; Leland Price and Takisha Fitzgerald, Assistant District Attorneys General for the appellee, State of Tennessee.

# OPINION
## I. Facts

This case arises from offenses surrounding the January 2007 carjacking, robbery, kidnapping, rape, and murder of C.C. and C.N., the victims.[1]  The victims in this case were last seen by friends on Saturday night, January 6, 2007.  Concern grew when the victims failed to show up at a party that night as planned and when C.C. failed to show up for work the following day, Sunday, January 7, 2007.  Family and friends located C.C.'s abandoned silver Toyota 4Runner on Sunday night, January 7, 2007, at the intersection of Glider Avenue and Chipman Street in Knoxville, Tennessee.  In the days following the victims' disappearance, C.C. was found dead in a garbage can inside 2316 Chipman Street, a residence leased to Lemaricus Davidson and Daphne Sutton, and C.N.'s body was found next to railroad tracks that ran behind 2316 Chipman Street.

A Knox County grand jury charged the Defendant with forty-six counts[2] for his role in these crimes.  The Defendant was charged with multiple counts of first degree murder, especially aggravated robbery, especially aggravated kidnapping, aggravated rape, and theft. Three co-defendants were also charged and convicted for these crimes: Lemaricus Devall Davidson, Letalvis Darnell Cobbins, and Vanessa Coleman.

At trial, Josh Anderson, C.N.'s best friend, testified that on Saturday, January 6, 2007, he and C.N. played golf together.  After golf, the two men went to Mr. Anderson's residence where C.N. spoke with his girlfriend, C.C., to make plans for the evening.  C.N. arranged to drop Mr. Anderson off at a mutual friend's party and then take C.C. to dinner before the couple returned to join their friends at the party.  C.N. drove Mr. Anderson in C.N.'s Chevy 2500 HD pick-up truck to the location of the party and then left to pick up C.C. at Kara Sowards's apartment and take her to dinner.  Mr. Anderson said that he became concerned at around 10:00 p.m. when C.C. and C.N. had not arrived at the party as planned.  Mr. Anderson placed telephone calls to both C.C. and C.N.'s cell phones, but neither phone was answered.

---

[1] It is the policy of this Court to protect the identity of victims of sexual offenses by referring to them and their immediate family members by their initials.

[2] On May 30, 2008, the Defendant filed a motion to cure a multiplicitous indictment.  Following a hearing, the trial court merged eight of the counts into other counts of the indictment, leaving thirty-eight remaining charges against the Defendant.

Mr. Anderson testified that he and a friend drove to Kara Sowards's apartment to see if they could find the couple. When they arrived, C.N.'s truck was parked in the parking lot, but C.C.'s vehicle, a silver Toyota 4Runner, was not there. The men knocked on the apartment door, but no one answered. It began raining, so Mr. Anderson retrieved the golf clubs that he and C.N. had left in the back of C.N.'s truck earlier in the day. While doing so, he looked inside the truck to see if C.N. had inadvertently left his cell phone in his vehicle as an explanation as to why C.N. had not answered any of his telephone calls. Mr. Anderson stated that he did not see C.N.'s cell phone inside the truck.

Mr. Anderson testified that the next morning, Sunday, January 7, 2007, he learned that C.C. had not shown up for work, which he described as a "red flag." Later in the day, Mr. Anderson learned of the area where C.N. and C.C.'s cell phones had last accessed a cell tower, and he joined a group in searching that area. It was in this area that C.C.'s 4Runner was found. Mr. Anderson said that C.C.'s vehicle was pulled off the road in the grass and stickers that had once been on the outside of the windows of the vehicle had been removed. He described one of the stickers as a "Power T" sticker. He also noted that the front seats in the vehicle were "leaned back really far," and there was mud inside, which he found inconsistent with how C.C. normally maintained her vehicle. Mr. Anderson said that he also noted a pack of Newport cigarettes in the car, which he thought strange because neither C.C. nor C.N. smoked cigarettes, and a cell phone charger that had been "ripped apart."

Mr. Anderson identified a photograph of the UT hat that C.N. had worn while playing golf on January 6, 2007. The photograph was taken of the hat after police had recovered the UT hat from a house located at 2316 Chipman Street. Mr. Anderson testified that he did not know the defendants charged in this case nor was he familiar with the residence at 2316 Chipman Street. He stated that neither C.C. nor C.N. knew the Defendant or any of the co-defendants or had ever been to the residence at 2316 Chipman Street prior to these offenses.

Kara Sowards testified that in January 2007 she lived at the Washington Ridge Apartments. She stated that her best friend, C.C., did not live with her but stayed at the apartment occasionally. Ms. Sowards recalled that C.C. arrived at her apartment at around 5:00 p.m. on Saturday, January 6, 2007. The two ran an errand together and then returned to the apartment to get ready for a birthday party at a friend's house. Ms. Sowards left for the party at around 8:00 p.m., while C.C. remained at the apartment waiting for C.N. to take her to dinner before the couple joined their friends at the party.

Ms. Sowards testified that she had been at the party for about an hour when she saw, through the bay window, C.N.'s truck pull into the driveway. When she didn't see C.C. and C.N. come in the house with the others that arrived at that time, she asked Mr. Anderson about C.C. and C.N. Mr. Anderson told her that C.N. had left to go pick up C.C. for dinner.

Ms. Sowards said that she immediately called C.C. to notify her that C.N. was on his way since C.C. had been waiting for C.N. for an hour. Approximately an hour and a half later, Ms. Sowards called C.C. again to see why she and C.N. had not arrived at the party. C.C. did not answer her phone, so Ms. Sowards sent a text message asking C.C.'s location. Ms. Sowards said that it was unusual for C.C. not to respond to Ms. Sowards's telephone calls or text messages. Ms. Sowards continued to call C.C.'s phone throughout the evening with no response.

Ms. Sowards testified that she returned from the party to her apartment at around 3:30 a.m. on Sunday, January 7, 2007. She said that she parked her car next to C.N.'s truck, thinking it was odd that his vehicle was in the parking lot, but C.C.'s vehicle was not. She explained that normally C.N. drove when he and C.C. went out together. When she went inside her apartment, she did not find C.C. or C.N..

Ms. Sowards testified that she awoke at 10:00 a.m. on Sunday, January 7, and once again called C.C.'s cell phone. She said that, this time, the phone went directly to voicemail without ringing. Later that day Ms. Sowards learned that C.C. had never arrived for work at the Shoe Department in West Town Mall on Sunday. On Sunday evening, she joined a group of people to search the area where C.C.'s cell phone had last accessed a cell tower. During the search of the area, C.C.'s vehicle was found on the side of the road near the intersection of Glider Avenue and Chipman Street. C.C.'s vehicle normally had several stickers on the windows, but the "Power T" sticker and an "orange North Face sticker" had been removed. Once police arrived and opened the vehicle, Ms. Sowards observed mud inside the vehicle inconsistent with how C.C. maintained her vehicle. She also noticed that the front seats were pushed all the way back and were leaned back to the furthest position.

Ms. Sowards identified photographs of the clothing she saw C.C. wearing on the night of January 6, 2007, before Ms. Sowards left for the birthday party. The clothing items were recovered from 2316 Chipman Street. Ms. Sowards also identified several items of clothing and an iPod that were in C.C.'s vehicle before this incident and were later recovered by the police from 2316 Chipman Street.

Ms. Sowards testified that the area where they found C.C.'s vehicle was several minutes from her apartment but in an area unfamiliar to her. She stated that C.C. had never been to this area before and did not know any of the people charged in this case.

Xavier Jenkins testified that in 2007 he worked as a driver for Waste Connections located on Chipman Street. On Sunday, January 7, 2007, Mr. Jenkins arrived at work at 12:30 a.m. He explained that he worked the third shift, which was from approximately 12:30 a.m. to 7:00 a.m. When he arrived, he parked in a parking lot outside the gate and waited for

4

his supervisor to arrive to unlock the gate. While waiting for his supervisor, Mr. Jenkins noticed that at the house next door, 2316 Chipman Street, the porch light was on and a 4Runner with illuminated headlights was parked in front of the house. Mr. Jenkins recalled that "it seemed pretty busy for that time of . . . night."

Mr. Jenkins testified that he waited in his vehicle because it was not a "good area of town to be parked in" late at night. After fifteen or twenty minutes, Mr. Jenkins drove to a nearby gas station and called his supervisor who explained he was running late. Mr. Jenkins said that he went into a nearby market to get peanut M & M's and a Pepsi and then returned to Waste Connections to continue to wait for his supervisor. He recalled that it was close to 1:00 a.m. by this point and that, as he waited, he noticed the 4Runner that was parked in front of the residence at 2316 Chipman Street "pull off." He stated, "And they pulled out and pulled around to actually look at me. . . . [W]hat struck me as kind of odd is that they slowed down to kind of check me out to see who I was." As the vehicle passed him, he saw four individuals in the 4Runner that appeared to be black males. Mr. Jenkins said the men seated in the 4Runner were "slumped down" and staring at him intently in a manner he described as "mean mugging." He said that all four men were looking directly at him as they slowly passed by.

Mr. Jenkins testified that, at the end of his work at 6:30 or 7:00 a.m., he returned to Waste Connections to clock out. When he arrived, he noticed the 4Runner was now parked in the parking lot he had waited in when he arrived at work at 12:30 a.m. He mentioned to his supervisor, "something's not right with that vehicle." He and his supervisor pulled behind the vehicle and did not see anyone inside. Mr. Jenkins suspected the vehicle was stolen so he looked at the vehicle tags but found that the vehicle was registered in Knox County. As he checked the vehicle tags, he noticed a "T" sticker in the middle of the rear window.

Jerome Arnold testified that in January 2007, he lived at 2124 Chipman Street approximately one block from 2316 Chipman Street. Mr. Arnold recalled that he was watching television at approximately 1:45 a.m. on Sunday, January 7, 2007, when he heard three loud "pops" from the area northeast of his house. He stated there were only three "pops," "fairly evenly spaced" and fairly close in succession.

Roy Thurman testified that in January 2007, he worked as a sandblaster at R & T Coatings, a powder coating company. Mr. Thurman arrived at work at 7:45 a.m. and waited outside for the owner of the business to arrive and unlock the front gate. As Mr. Thurman waited, he noticed smoke rising up from "the rail road tracks," an area behind the business at which he worked. He did not give the smoke much thought until later that day when he learned that police had found a body in that same area.

5

J.D. Ford, a Norfolk Southern Railway locomotive engineer, testified that he arrived at work at around 8:15 a.m. on Sunday, January 7, 2007. Mr. Ford said that, on this particular day, he was doing his "regular run" from Knoxville to Chattanooga. After leaving the yard, he noticed a fire near the train track. Initially it drew his attention because he thought he saw a log in the fire. As he drew closer he made out the silhouette of a body, so he stopped the train and notified the chief dispatcher who instructed him to wait at that location. Mr. Ford said that he approached the fire closely enough to confirm that the "badly burned" body was an unclothed male. Mr. Ford estimated that he first saw the body between 12:15 p.m. and 12:23 p.m. on January 7, 2007.

Russell Whitfield, a Knoxville Police Department officer, testified that he worked in the forensics unit, and he was called to the crime scene near the railroad tracks. Once there, he photographed evidence around the area where the fire and body were found and collected a multi-colored piece of cloth from the railroad tracks. After finishing his work in the direct area of the fire, Officer Whitfield walked a short distance looking for additional evidence. Approximately fifty yards from the fire area, Officer Whitfield found a long piece of multi-colored cloth tied in knots and the broken end of a blue dog leash. He said the cloth appeared to be the same type of material as the cloth he had collected from the railroad tracks, so he photographed and collected both the multi-colored cloth and the dog leash.

Robert Watson testified that in 2007 he worked as a Special Agent for the Tennessee State Fire Marshal. Mr. Watson reported to the area of the fire, which he described as "thick with the briars," and an area where one would not normally go. Mr. Watson collected several samples from the area and transported the samples to the Tennessee Bureau of Investigation ("TBI") for analysis.

Laura Hodge, a Tennessee Bureau of Investigation Forensic Scientist, testified as an expert witness in the field of debris microanalysis. She analyzed two samples of soil and rocks collected from the railroad track area for ignitable liquids. Her analysis revealed the presence of "evaporated gasoline range products."

Sandra Bible testified that, in January 2007, she lived at 1121 Glider Avenue located at the corner of Chipman Street and Glider Avenue. Ms. Bible recalled being awakened by police knocking on her front door at 1:45 a.m. on Monday, January 8, 2007. She said that the police wanted to know about a silver 4Runner, unfamiliar to Ms. Bible, parked at the stop sign in front of her house. Ms. Bible said that she had been out on her front porch "about midnight" and that the vehicle had not been parked in front of her house at that time.

Daniel Crenshaw[3], a Knoxville Police Department evidence technician, testified as an expert in print identification. He stated that, on Monday, January 8, 2007, at approximately 2:00 a.m., a patrol sergeant requested that he photograph a vehicle at the intersection of Glider Avenue and Chipman Street that might be related to a missing person report. When Mr. Crenshaw arrived, he found a silver Toyota 4Runner parked on the side of Glider Avenue facing Chipman Street, a little more than two blocks from 2316 Chipman Street. He said that he took photographs, inventoried the vehicle, and processed the exterior nonporous surfaces for fingerprints. Mr. Crenshaw noted in his report that, due to the difficulty of retrieving any "good clean prints," he believed the 4Runner had been "wiped down."

Mr. Crenshaw testified that he found a bank envelope in a woman's jacket in the back seat of the 4Runner. He developed several fingerprints on the envelope that were a match to Lemaricus Davidson. Mr. Crenshaw stated that he was able to confirm the match between the fingerprints recovered off the bank envelope and Davidson's fingerprints by 7:30 a.m. Tuesday, January 9, 2007. Mr. Crenshaw obtained an address for Davidson, 2316 Chipman Street, and drove by the residence on Tuesday morning, January 9, 2007, before his shift ended at 7:00 a.m. He said that he did not make any contact with the occupants of the residence but merely drove by the address. He said that he could see "a TV or something on inside" but that he saw no sign of activity in the house.

Mr. Crenshaw testified that when he returned to work on Tuesday night, January 9, 2007, he and Timothy Schade, another technician, worked with items police officers had recovered from a search of 2316 Chipman Street during the day. He and Mr. Schade developed identifiable fingerprints on three of the trash bags surrounding C.C.'s body found in the trash bin in the kitchen at 2316 Chipman Street. Mr. Crenshaw matched the print from one of the trash bags to Davidson's palm print. Mr. Schade matched prints taken from the other two bags to Davidson as well. Davidson's prints were also identified on C.C.'s pay stub, a Blockbuster card, a trash bag box, a 9-millimeter magazine, and a photograph of C.C. All of these items were recovered from the residence at 2316 Chipman Street.

On cross-examination, Mr. Crenshaw testified that fingerprints found on items at the crime scene were also matched to Letalvis Cobbins. He confirmed that he was unable to positively match the Defendant's prints to any latent fingerprints obtained in this case.

Keith DeBow, the commander of the Knoxville Police Department's Special Operations Squad, testified that, on Tuesday, January 9, 2007, he assisted the Major Crimes

---

[3] By agreement of the parties, Daniel Crenshaw's testimony from a prior hearing was read into the record.

Unit in executing a search warrant at 2316 Chipman Street. He explained that his unit's role was to enter, clear, and secure the residence to allow other officers to continue to investigate these crimes. The investigators attempted to gain entrance and, when they received no response, the Special Operations Squad announced a police presence and entered the residence. As Lieutenant DeBow cleared the residence, he noticed pistol magazines in the bedroom and a carbine rifle in the closet of the bedroom. After clearing the inside of the residence, Lieutenant DeBow entered the kitchen of the residence and noticed a trash can in the corner that was "oddly out of shape." He pointed out the trash can to Lieutenant Fortner and both officers drew their weapons. Lieutenant DeBow approached the trash can with his weapon fixed and opened the lid to find C.C.'s arm exposed among cloth material.

Lieutenant DeBow testified that his squad assisted the Major Crimes Unit with the arrest of Lemaricus Davidson on Thursday, January 11, 2007, at an abandoned house off of Western Avenue in Knoxville, Tennessee.

Joe Cox, a Knoxville Police Department officer, testified that, on Tuesday, January 9, 2007, he assisted in processing the crime scene at 2316 Chipman Street. Officer Cox identified photographs he had taken of the crime scene. Police officers found an ammunition magazine, five .22 caliber long rifle cartridge cases, items used to clean the barrels of firearms, an empty box of .22 caliber rounds, multiple .22 caliber rounds, a .22 caliber cartridge, a gun case, and a carbine rifle. In the kitchen, a spray bottle containing bleach was found in the sink. Police officers also recovered DVDs: "The Manchurian Candidate," "That's Collateral," and "The 40-Year-Old Virgin," each with a label indicating the DVD was from Marion County Public Library in Lebanon, Kentucky. Officer Cox said an iPod with the inscription, "[C.C.], Love You, Mom and Dad," was found in a plastic container between the bed and the wall in the north bedroom of the house.

Officer Cox testified that three garbage bags were recovered from 2316 Chipman Street. Two were found in the utility room at the rear of the house and one garbage bag was found in the kitchen next to the garbage can containing C.C.'s body. In one of the garbage bags found in the utility room were many clothing items, later identified as C.C.'s, as well as C.C.'s personal items and purse. Baseball caps, shoes, a can of Copenhagen tobacco, and other personal items later determined to be C.N.'s were also found among the garbage bags. Scraps of floral patterned sheets were found in the trash bags as well as an empty bottle of bleach. Also recovered from one of the garbage bags was a burned Tennessee driver's license, identified as C.N.'s license. Big Star blue jeans, C.C.'s purse and identifying items inside, her pay stub from Shoe Department, personal photographs, and notes written to C.C. were also recovered from the garbage bags.

Officer Cox identified a photograph of a red skirt found in the living room of 2316

8

Chipman Street and a Sears bag with a pair of green pants inside found lying near the table in the living room.

The parties stipulated to the admission of records from the Marion County Public Library reflecting that the four DVDs found at 2316 Chipman Street, "The 40-Year Old Virgin," "Collateral," "Man on Fire," and "The Manchurian Candidate," were all checked out by the Defendant from the Marion County Public Library in Kentucky.

M.N., C.N.'s mother, testified that in January 2007, C.N. worked at B & F Construction Company as a trim carpenter. She said that C.N. was twenty-three years old at the time and lived at home with her and his father. She recalled that on Saturday, January 6, 2007, he played golf and then came home briefly to shower. When he came downstairs after showering, at about 6:30 or 7:00 p.m., she offered him something to eat, but he declined, stating that he was going to eat with C.C.. She recalled that he wore blue jeans, a navy blue sweater over a shirt, and a baseball cap. M.N. said that C.N. did not return home that night but that his absence initially did not raise concern because he occasionally spent the night at a friend's home.

M.N. testified that she had tried to call C.N. that night but with no response. She said that normally, C.N. "would have always" called her back. On Sunday afternoon, January 7, 2007, C.C.'s mother called and told her that C.C. had not shown up for work. M.N. described C.C.'s absence from work as "highly unusual," and she grew concerned that "something had happened" to prevent C.N. from returning her telephone calls. Upon receiving this information, M.N. said that she immediately began praying that she could find C.N. She called the police to report him missing and then, at the advice of the police, began calling area hospitals. M.N. said that C.N. was not at any of the hospitals and that it never occurred to her to call a morgue because she thought "something like that couldn't have possibly happened to him."

M.N. testified that she stayed up all Sunday night waiting to hear news about C.N. The following morning, Monday, January 8, 2007, a police detective called and asked if he could come to the house and retrieve "some DNA on [C.N.]" Approximately an hour after the detective came out to the house, he returned to notify the family that C.N. was dead. M.N. said that she did not have much of a memory of the immediate events after she learned of C.N.'s death, explaining, "It was just - - just the most devastating news I had ever heard and nothing that we ever imagined."

M.N. testified that she did not believe C.N. would go to the "Chipman Street area." She stated that, to her knowledge, C.N. did not know any of the defendants. M.N. identified a pair of Nike shoes that C.N. had recently gotten for Christmas and law enforcement officers

9

found in the room where Lemaricus Davidson was taken into custody. She also identified the receipt that she provided to police showing the value of the shoes as $136.56. M.N. identified baseball caps found in the residence at 2316 Chipman Street as C.N.'s hats. One was a Tennessee baseball cap and the other a hat with "B & F Construction" on it. M.N. also identified other items found at 2316 Chipman Street, such as a belt, a can of Skoal tobacco, more hats, a driver's license, a hair brush, and a set of car keys as C.N.'s possessions.

D.C., C.C.'s mother, testified that she, her husband, and their two children had lived in Knoxville since October 1993. C.C. attended the University of Tennessee where she would have graduated in December 2007. D.C. said that C.C. also worked as an assistant manager at Shoe Department in West Town Mall.

D.C. testified that C.C. drove a leased 2005 silver Toyota 4Runner, Sports edition, valued at "around [$]30,000." D.C. confirmed that C.C. had both a cell phone and her own bank account. D.C. stated that, at the time of these events, C.C. had just cleaned out her closet and had several garbage bags of clothing and items in the trunk area of her vehicle to take to either Planet Exchange and/or Goodwill. D.C. said that C.C. often kept an overnight bag because she stayed frequently at Ms. Sowards's residence since they had similar schedules and would drive one car to classes every day. D.C. described other items such as C.C.'s iPod, a phone charger and various "girl stuff" such as pictures and a little teddy bear that C.C. kept in her vehicle. D.C. stated that, although the car was full of various items, it was always kept clean as part of a promise C.C. had made to her father when she got the car. D.C. said that her husband cleaned the car for C.C. and would "fuss" at C.C. if the inside of the 4Runner was dirty. D.C. explained that the 4Runner was C.C.'s "dream car," and she and her husband bought it for C.C. because of her good grades and hard work.

D.C. testified about the last time she saw C.C. She said that, on Saturday, January 6, 2007, C.C. was preparing to go into work at noon. D.C. sat in the bedroom with C.C. while C.C. decided what to wear to a friend's birthday party that she would be attending that night after work. D.C. recalled that C.C. selected a pair of Big Star blue jeans and a new navy, white, and hot pink sweater with hot pink shoes to wear to the party later that night. C.C. placed the clothes for the party in a green bag with orange, red, and white stripes with a leather trim that she had received for Christmas. Along with the bag, C.C. took a gray purse with silver trim with her as she left for work. D.C. said that C.C. wore a pair of tan minichords, an orange T-shirt, and a pair of Wallaby shoes when she left their home that day to go to work.

D.C. testified that she did not expect C.C. to come home that night because C.C. planned to spend the night at Ms. Sowards's apartment after the party. C.C. called D.C. at around 5:00 p.m. on Saturday afternoon, January 6, 2007, to tell her she had left work early

10

and was running a few errands before going to Ms. Sowards's apartment. C.C. called again that night at around 12:35 a.m., and C.C.'s father answered the telephone. C.C. called to say that she had changed her plans and was not going to spend the night at Ms. Sowards's apartment. She told her father that she was at Ms. Sowards's apartment and was going to finish watching a movie before coming home at around 3:00 a.m.

D.C. testified that she could not sleep so she decided to wait up for C.C. to arrive home. At 4:00 a.m. when C.C. had not arrived home, D.C. called C.C.'s cell phone. C.C.'s cell phone rang, unanswered, and then went to the voicemail message. D.C. tried again to call and this time the call went directly to the voicemail message. D.C. said she could not recall whether she tried to call a third time but remembered drifting off to sleep around 5:00 a.m. She woke up at 6:00 a.m. when her husband got up to go to work and continued trying to make contact with C.C. D.C. said it was unusual for C.C. not to return D.C.'s calls.

D.C. testified that at around 3:30 p.m. Sunday afternoon, January 7, 2007, C.C.'s boss from the Shoe Department called to inquire about C.C. because she had not opened the store at 12:00 p.m. that day. D.C. said that this confirmed her "worst nightmare" and that she notified her husband and then began calling hospitals. When none of the hospitals had a "Jane Doe" or person admitted with her daughter's name, she called 911 and reported C.C. missing. She also called C.N.'s family about her concern for the victims. D.C. contacted her cell phone company and found that the last cell phone tower accessed for C.C.'s cell phone was the "Cherry Street tower." Based on this information a group of people did a "grid search" in the area and located C.C.'s 4Runner. D.C. said that she remained at home while the others searched in case someone called the house.

D.C. testified that she had an extra set of keys for C.C.'s 4Runner, so, when the 4Runner was found, she drove to the corner of Glider Avenue and Chipman Street to take the keys to her husband. When she arrived, she noticed that a "Power T" sticker that had once been in the center of the back window was gone. A North Face sticker that had been on the vehicle was also gone. On the back side windows there had been two "tiny Power Ts," and those were also missing, along with a silver UT license plate. A University of Texas sticker, however, remained on the front windshield of the car.

After the police opened C.C.'s vehicle with the extra set of keys, D.C. noticed that the front seats were moved to the furthest back position where C.C. could not have reached the pedals and that both seats were in a leaned back position. She also noticed that there was nothing in the vehicle. The pictures, the teddy bear, the bags of clothing, iPod, and the phone charger were all gone and there was mud in the vehicle. D.C. identified many of the items that should have been in the car, the clothing C.C. wore, and the bag she carried to work on Saturday, January 6, 2007, as all items that police officers had recovered from the house at

11

2316 Chipman Street. D.C. also identified her own high school graduation picture that C.C. kept in her wallet as an item recovered from the house at 2316 Chipman Street.

D.C. testified that she had never known C.C. to be in the Chipman Street area and that she was familiar with all of C.C.'s friends because C.C.'s friends "pretty much grew up in our house." She stated that she had never heard of or met any of the defendants.

Randall Nelson, a TBI forensic scientist, testified as an expert witness in the field of chemical analysis. Agent Nelson tested a white tank-top type shirt containing stains. The tank-top was worn by C.C. when police found her body. Agent Nelson tested the stained areas and found the presence of bleach.

Timothy Schade, a Knoxville Police Department evidence technician, testified as an expert witness in the field of print identification. Mr. Schade examined an ammunition magazine found on a shelf in the front bedroom of 2316 Chipman Street. Mr. Schade identified ridge detail on the magazine and compared the ridge detail to identifiable latent fingerprints. Based upon these comparisons, the left middle fingerprint for Lemaricus Davidson and the right middle fingerprint for Letalvis Cobbins were identified. Mr. Schade testified that he collected five garbage bags from the Medical Examiner in connection with the autopsy of C.C. He collected latent prints from three of the five bags and all the prints were matched to Davidson. Mr. Schade stated that he did not find any latent fingerprints on any of the objects tested that were matched to the Defendant.

Linda Littlejohn, TBI Forensic Scientist, testified as an expert witness in the field of forensic microanalysis in the area of physical examination. During this investigation, Agent Littlejohn was asked to examine several pieces of fabric collected during the victims' autopsies, from 2316 Chipman Street, and from the railroad tracks. Agent Littlejohn's analysis confirmed that some of the fabric collected from C.C.'s autopsy and two pieces of fabric from the garbage bag found in the kitchen at 2316 Chipman Street were originally part of the same piece of fabric. As to a piece of burned fabric recovered during C.N.'s autopsy and material recovered during C.C.'s autopsy, Agent Littlejohn found these materials to be consistent with coming from a similar larger piece of fabric, possibly a curtain. She stated that it was possible for all the cloth collected to be apart of "a bedroom suit of some sort" because the fragment pieces submitted were consistent. Agent Littlejohn stated:

> There was a pillow sham, a curtain, a curtain tie, two valance curtains, two pieces of fabric that fractured match together to form a complete curtain and seven pieces of fabric that do not form a complete curtain.
>
> They all had the same pattern and color, so, you know, that they could

12

have come from, you know, a bedroom suit of some sort.

Daphne Sutton testified that she began dating Davidson in the Fall of 2006 and that she and her two children moved into 2316 Chipman Street with Davidson. She stated that both her name and Davidson's name appeared on the lease paperwork. After moving into the house, Davidson began "putting his hands on" Ms. Sutton, and the couple began arguing "more." This unrest caused Ms. Sutton to move out of the house with her furniture around Thanksgiving 2006; however, she returned to the residence in December 2006. Ms. Sutton stated that, when she returned, she did not bring her two children with her. She said that in December "[i]t started out fine and ended up the same way, arguing and fighting," resulting in Ms. Sutton leaving the residence once again on January 5, 2007.

Ms. Sutton testified that in December 2006, she met Letalvis Cobbins, one of Davidson's family members. She recalled also meeting the Defendant, Stacy Lawson, Vanessa Coleman, and Natosha Hays. She said that these people stayed at the 2316 Chipman Street residence and were from Lebanon, Kentucky. She described the sleeping arrangements at 2316 Chipman Street during this time as follows: she and Davidson slept in the front bedroom, Cobbins and Coleman slept in the south bedroom, and the Defendant slept on a "pallet" in the living room. Ms. Sutton recalled the morning of Friday, January 5, 2007. She stated that present in the house were Davidson, Cobbins, Coleman and the Defendant. She recalled that she and Davidson engaged in an argument during which he "put his hands" on her again. She described his physical contact as choking her and then throwing her up against a wall. She said that, because there were no doors throughout the house, she was certain the other parties heard the argument but that no one intervened.

Ms. Sutton testified that no one in the house had a working car, and only Davidson had a cell phone. She left the house after the altercation with Davidson and walked to a nearby gas station to call a friend to come and pick her up. Davidson followed her until she went inside the gas station to use the telephone, and then he turned around and walked away. Ms. Sutton said that her friend Kassie Suttles came and picked her up and took her back to Ms. Suttles's apartment. Ms. Sutton stayed at this apartment for the weekend, and on Sunday, January 7, 2007, she learned that Davidson was trying to contact her. Ms. Sutton explained that she did not have a cell phone but that her friends, Ms. Suttles and Brandy Pressley, with whom she was staying, shared a cell phone. She spoke with Davidson by telephone on Sunday, January 7, 2007, and then immediately went to 2316 Chipman Street, suspecting there was a woman in the house.

Ms. Sutton testified that she arrived at 2316 Chipman Street at around 6:00 or 7:00 p.m. on Sunday, January 7, 2007, and that Davidson was standing at the front of the house inside the enclosed porch. She noticed that Davidson had put up a blanket in the doorway

13

that led into the living room. Ms. Sutton went inside the house to the bathroom to retrieve her make-up and perfume, but the door was locked. Davidson told her that Coleman was in the bathroom. Ms. Sutton said that she then went through the living room to the kitchen to try to access the bathroom through the south bedroom, suspecting there was a woman in the bathroom. Davidson grabbed her by the arm when she reached the kitchen and asked her what she was doing. She said that both the Defendant and Cobbins were present inside the house at the time but that neither spoke to her. Cobbins was seated in a chair next to the kitchen door, and the Defendant was seated in a chair in front of the entertainment center, rolling marijuana in a cigar. Ms. Sutton said that she never saw Coleman.

Ms. Sutton testified that she walked out onto the enclosed porch, and Davidson handed her a bag of clothing and tried to give her a small amount of cash. Ms. Sutton refused the money but took the bag of clothing and left. Once back at Ms. Suttles and Ms. Pressley's apartment, she began sorting through the clothing and found a red skirt. She thought this was odd because the gang with which Davidson was affiliated "didn't like red," and Davidson "didn't want [her] to wear red." She stated that the clothing was "supposed to be new," but clearly was not new. She also noted that the pants were not her size. She immediately called Davidson and questioned him about the clothing, telling him to come and take the clothing away. She said that, from the bag of clothing, she gave a pair of "Glo jeans" to her friend Ms. Pressley before she returned the bag to Davidson.

Ms. Sutton testified that Davidson drove to Ms. Suttles and Ms. Pressley's apartment twice that day. She could not recall on which occasion, but, at one point, she observed Davidson leaving the apartment complex in a 4Runner with an orange T and a North Face sticker on the back window. At some point, Davidson asked her to meet him on a "side road" of Chipman Street. When she picked him up, she noticed that Davidson wore a pair of shoes that appeared "a little small." She later identified a photograph of C.N.'s Nike "Shox" shoes as the ones worn by Davidson that night. Davidson returned to Ms. Suttles and Ms. Pressley's apartment with Ms. Sutton and contacted Vince Wernimont to arrange for Davidson to pick up "money in a brown paper bag" in the trash can at Buddy's Bar-B-Q. Ms. Sutton acknowledged that this arrangement should have raised suspicion, but Davidson was to buy cocaine for himself and pills for the females with the money "so [they] didn't care." After getting the money and drugs, Davidson, Ms. Sutton, Ms. Suttles, and Ms. Pressley returned to the apartment late Sunday night, January 7, 2007, or early in the morning Monday, January 8, 2007.

Ms. Sutton testified that Davidson remained with her throughout Monday, January 8, 2007, and spent Monday night at the apartment. On Tuesday morning, January 9, 2007, Ms. Pressley brought the shared cell phone to Ms. Sutton. Ms. Sutton's mother was on the telephone, informing Ms. Sutton that a dead female had been found inside 2316 Chipman

14

Street. About Davidson's response to this news, Ms. Sutton stated, "I remember [Davidson] was laying beside me and I think he could hear my mom through the phone. Because he was - - his eyes got really big. And as soon as I got off the phone, he just kept saying, please, please - -." Ms. Sutton said that she told Davidson that he must leave but allowed him to remain until "the sun went down," as he requested. After dark, she dropped him off at a park on Western Avenue beside Ridgebrook Apartments.

Ms. Sutton testified that, while she straightened up around Ms. Suttles and Ms. Pressley's apartment, she found a gun and house keys in Davidson's jacket. She identified a photograph of Davidson's gun. Ms. Sutton identified a photograph of Eric Boyd, a friend of Davidson's from prison. She stated that Mr. Boyd did not like her because "he was Muslim and [she] was white." Ms. Sutton agreed that she knew Ethel Freeman. She said Davidson referred to Ms. Freeman as his aunt. She said that she and Davidson helped Ms. Freeman move, and Ms. Freeman gave them a floral bedroom set that she described as "hideous." Ms. Sutton identified a photograph of the curtains that were part of the bedroom set. She said the curtains had been brand new, still in the original packaging, and she had stored the curtains underneath the kitchen sink at 2316 Chipman Street. Ms. Sutton also identified photographs of portions of the bedroom set collected from the crime scenes that she had stored in the south bedroom closet at 2316 Chipman Street.

Ms. Sutton viewed video footage the police recorded of 2316 Chipman Street and noted that the trash can was normally kept in the utility room and not the kitchen. When asked what appeared "different" in the video footage of 2316 Chipman Street from her memory of the residence, she stated that the presence of the gas can in the residence was "out of place," and "very unusual." She said that, before, there were no bullet holes in the wall or ceiling of the living room and that a chair was not normally kept in the bathroom nor were there "plates and stuff" in the shower. Ms. Sutton testified that she was not aware of any of the defendants being employed.

On cross-examination, Ms. Sutton testified that, when she returned to 2316 Chipman Street on Sunday, January 7, 2007, she did not see a Toyota 4Runner or Boyd.

Kassie Suttles testified that she worked at Sonic on North Broadway with Ms. Sutton. Ms. Suttles stated that, in January 2007, she knew Davidson through Ms. Sutton. Ms. Suttles recalled receiving a telephone call from Ms. Sutton on Friday, January 5, 2007, after which Ms. Suttles drove to pick up Ms. Sutton from a gas station "off Cherry Street." The two women returned to the apartment Ms. Suttles shared with Ms. Pressley. Ms. Suttles explained that she and Ms. Pressley also shared a cell phone. Ms. Suttles said that, while Ms. Sutton stayed at the apartment, people contacted Ms. Sutton through this shared cell phone.

15

Ms. Suttles testified that on Sunday, January 7, 2007, she drove Ms. Sutton to 2316 Chipman Street, at around 5:00 p.m. Ms. Suttles described the house as "small." She explained that Davidson had earlier that day been to her apartment in a Toyota 4Runner. When they arrived at 2316 Chipman Street, Davidson was waiting for Ms. Sutton on the front porch. Davidson and Ms. Sutton went inside the house to retrieve Ms. Sutton's belongings while Ms. Suttles and Ms. Pressley remained in the car. Ms. Sutton returned to the car between five and ten minutes later with a bag, and the three women returned to their apartment. Ms. Suttles said that, as Ms. Sutton sorted through the clothing, she stated that Davidson had told her he had bought her new clothes, but the clothing in the bag had been worn. Later that same day, Davidson again came to the apartment. Ms. Suttles looked out the window and saw a Toyota 4Runner. Ms. Suttles said that she observed Davidson get out of the back passenger seat but that she could not see who was in the driver's seat or the front passenger's seat.

Ms. Suttles testified that on Monday, January 8, 2007, Davidson asked if he could stay at her apartment because his "brother" had locked him out of 2316 Chipman Street. Ms. Suttles agreed, and Davidson arrived around midday and stayed throughout the night. On Tuesday, January 9, 2007, Ms. Sutton's mother called and asked to speak with Ms. Sutton. After this telephone conversation, Ms. Suttles and Ms. Sutton drove Davidson to a park next to Ridgebrook apartment complex. Ms. Suttles recalled a pair of Glo blue jeans that were in the bags of clothing Davidson gave Ms. Sutton. Police later collected these jeans from Ms. Sutton.

On cross-examination, Ms. Suttles agreed that Ms. Sutton was upset after learning from her mother that a body had been found in the house at 2316 Chipman Street. She agreed that neither she nor Ms. Sutton notified the police that Davidson was at the apartment. After they dropped Davidson off at the park, a U.S. Marshal called Ms. Suttles, and she met law enforcement officers at a Walgreens. Ms. Suttles stated that she told the U.S. Marshals everything she knew regarding these incidents.

Gerald Smith testified that in 2007 he worked for the Knoxville Police Department. Officer Smith stated that at 3:45 p.m. on Thursday, January 11, 2007, he responded to 1800 Reynolds Street, near the Ridgebrook apartment complex. Officer Smith said that Davidson had been found in an unoccupied residence at this location, and Officer Smith's role was to process and document all items left by Davidson at the unoccupied residence. Officer Smith said that Davidson was taken from the front northwest room of the house where there was a chair and several personal items. The police found a black hooded sweat jacket, a Motorola cell phone, a set of Tasco binoculars, a white, long-sleeve shirt, and a pair of Nike "Shox" tennis shoes in the room. A charger for the cell phone was plugged into an outlet on the wall. Inside the right, front pocket of the black jacket, the police found a nine-shot .22 caliber

Sentinel revolver.

Patricia Ann Resig, a firearms examiner for the Knoxville Police Department, testified as an expert in firearms examination. Officer Resig said that she examined two firearms in relation to this case. The first firearm was a .22 caliber high-standard Sentinel revolver recovered from the room of the abandoned house where Davidson was taken into custody. Officer Resig said that she test fired the .22 caliber Sentinel double-action revolver and found it to be functioning properly. She also test fired a .22 caliber Clerke double-action revolver and found it was functional, but the cylinder assembly frequently failed to rotate and lock. Officer Resig examined five fired .22 long rifle cartridge cases and concluded that all were fired from the .22 caliber high-standard Sentinel revolver. Officer Resig examined the three fired .22 long rifle bullets recovered from C.N.'s neck, back and skull. She described these bullets as "small." She concluded that two of the bullets, retrieved from C.N.'s back and neck, were fired from the same unknown barrel. The third bullet retrieved from C.N.'s skull displayed similar class characteristics as the other two bullets, but there was a lack of sufficient matching individual characteristics to confirm that it came from the same gun as the other two bullets.

Officer Resig testified about the .30 caliber universal carbine rifle found in the south bedroom of the house at 2316 Chipman Street. The firearm functioned properly when test fired. Officer Resig testified that she also prepared the crime scene diagram and measurements for 2316 Chipman Street. She provided individual measurements for each of the rooms in the house, and she calculated the total square footage of the residence as 805.8 square feet.

Darin Williams testified that he bought crack and powder cocaine from Davidson during the month of January in 2007. Mr. Williams recalled one evening in January 2007 when he drove to Davidson's house on Chipman Street to buy drugs. As he approached the residence in his car, he noticed a Toyota 4Runner honking at him. Not recognizing the 4Runner, he continued on toward 2316 Chipman Street. As he neared the residence, he saw the same 4Runner come around the corner and stop. Davidson got out of the driver's seat of the silver Toyota 4Runner and told Mr. Williams "there was nothing going on." Mr. Williams stated that he understood this to mean that he would be unable to buy any drugs. As Davidson spoke to him, a man got out of the rear passenger side door of the 4Runner and walked around behind the vehicle and stood. Another man got out of the front passenger seat of the 4Runner and stood "at the other side, the front." He believed there was a fourth man that remained seated inside the back of the vehicle. After learning he would be unable to buy drugs from Davidson, Mr. Williams left without entering 2316 Chipman Street.

Mr. Williams testified that later he returned to 2316 Chipman Street to see if

17

Davidson had obtained any drugs to sell. This time he saw the 4Runner parked across the street in a gravel lot. Mr. Williams recalled that this trip to 2316 Chipman Street was during the day and that Davidson came outside of the house to speak with Mr. Williams. Mr. Williams was once again unable to buy drugs and stated that he did not go inside the house on this occasion either.

Jody Long testified that, in January 2007, Vince Wernimont was her "drug connection" and asked her to "drive some people." Ms. Long said that she met Mr. Wernimont and followed him over to a house. She did not recall the exact date but stated that it was on a Monday or a Tuesday. She said she went into the house briefly and then a black female and two black males put their belongings in the trunk of her car, and she drove them to Kentucky. She estimated the drive was approximately four hours. She said it was dark when she dropped off the passengers at "the little white house" before driving back to Mr. Wernimont's house. She recalled a female opening the front door of the house to let them in. Ms. Long identified the Defendant as one of the two black males she drove from Knoxville to Kentucky in January 2007.

Stacy Lawson testified that in December 2006, she lived in Lebanon, Kentucky and was dating the Defendant. Ms. Lawson explained that she met the Defendant through her friend "Venetra" who was dating Cobbins, who she knew as "Rome." She also knew Vanessa Coleman, "one of Rome's girlfriends," and Natosha Hays, both of whom lived in Lebanon, Kentucky. Ms. Lawson said that she met Davidson, also known as "Slim," in Knoxville through Cobbins. She stated that she also met a man named Vince Wernimont during a trip to Knoxville.

Ms. Lawson testified that in December 2006, she had been dating the Defendant for approximately a year. On Friday, December 1, 2006, she, the Defendant, Cobbins, and Venetra drove in her car, a 1997 green Grand Am, to Davidson's house on Chipman Street in Knoxville, Tennessee. Ms. Lawson said that Davidson and Ms. Sutton slept in the front bedroom, she and the Defendant slept in the living room, while Cobbins and Venetra slept in the south bedroom. The group stayed only one night and then returned to Lebanon, Kentucky.

Ms. Lawson testified that on Thursday, December 14, 2006, another trip was made to Knoxville. She said that she and the Defendant drove in her car and Cobbins, Natosha Hays, "Little Daddy," and "Lauren," drove in Lauren's car. This group also stayed at 2316 Chipman Street while in Knoxville. This time, however, only Davidson was at the residence because Ms. Sutton had moved out. It was during this trip that she, Davidson, Cobbins, and the Defendant helped Ethel Lynn Freeman pack her house and move into an apartment. Ms. Lawson recalled staying in Knoxville for three days before returning to Lebanon, Kentucky.

18

About 2316 Chipman Street, Ms. Lawson stated:

> It is a very small house. You got no peace in that house. It was loud all the time. You could hear everybody's conversations. You could be in the living room and you could hear - - I remember it was Sutton and Davidson in their bedroom, and you could hear them having relations. The same with Coleman and Cobbins, you could hear them in the back bedroom having relations.

> There were no doors in that house. There was a sliding plastic thing that you really couldn't even call a door. And they used blankets as doors.

Ms. Lawson testified about a third trip to Knoxville after Christmas on Thursday, December 28, 2006. She once again drove her car with the Defendant, Cobbins, and Coleman to Knoxville and they stayed at 2316 Chipman Street. Ms. Lawson stated that the only people in the house with a cell phone were her and Davidson. Ms. Lawson stated that they "didn't do anything" this trip but "the routine." She said that they went to Vince Wernimont's house once and that Cobbins and the Defendant obtained job applications from a factory. She said that no one staying in the Chipman Street house was employed.

Ms. Lawson testified that on New Year's Eve, the group stayed at the Chipman Street house all night but that, at around midnight, the group went outside and fired guns straight up in the air. She said that she and Coleman fired Davidson's dark brown revolver, and Cobbins fired a silver revolver. She said that the Defendant did not fire either of the guns. She recalled that on New Year's Day, she, the Defendant, Coleman, and Cobbins were playing cards in the living room. She said that she said "something to upset" Davidson and that he retrieved an assault rifle from his bedroom and pointed it at her face. Ms. Lawson identified the assault rife in a photograph of an assault rife retrieved from Davidson's bedroom closet. She said that this made her feel "very, very uncomfortable," causing her to decide to return to Kentucky. She contacted her mother and asked her to send her money for the return trip. Ms. Lawson asked the Defendant, Cobbins, and Coleman to return to Kentucky with her, but they all refused. After getting the money her mother had wired through Western Union, Ms. Lawson once again asked the Defendant to come with her, but he stated he did not want to go back to sleeping in a car, so he remained at 2316 Chipman Street.

Ms. Lawson testified that after returning to Kentucky she attempted to contact the Defendant by calling Davidson's cell phone but never reached him. Thereafter, her cell phone service was discontinued. On January 10, 2007, Ms. Lawson was staying at her

parents' home and returned a telephone call from Ms. Hays, who handed the telephone to the Defendant. Ms. Lawson was surprised to find that the Defendant was in Lebanon, Kentucky. She drove to Ms. Hays's home where she found Ms. Hays, the Defendant, Coleman, and Cobbins in the living room. She said that "[t]hey didn't look like themselves." She said she sensed something was wrong and that all four appeared "scared." She asked the Defendant "what was going on," but he "didn't really have much to say."

Ms. Lawson testified that, as she sat in Ms. Hays's living room talking with Ms. Coleman, she heard sound from the computer upstairs announcing "Knoxville News." She went upstairs, and the Defendant, Cobbins, and Ms. Hays were watching a news segment where pictures of Davidson and Cobbins were displayed as suspects. After viewing the news segment, Ms. Lawson asked the Defendant about the news segment, and the Defendant did not respond. Ms. Lawson returned to her parents' home later that evening, because Ms. Hays would not allow her to stay at her home. On Thursday morning, January 11, 2007, as Ms. Lawson was pulling out of her parents' driveway, she was stopped by "a lot of law enforcement." Initially she denied knowing the whereabouts of the Defendant and Cobbins. When one of the U.S. Marshals told Ms. Lawson that he believed she was lying, she told law enforcement that the men were at Ms. Hays's house. Ms. Lawson was then transported to the Lebanon Police Department and interviewed.

Natosha Hays testified that in December 2006, she lived on Shuck Avenue in Lebanon, Kentucky. Ms. Hays stated that she met the Defendant and Cobbins when all three worked at an Amazon distribution facility in Kentucky. She said she knew Coleman as Cobbins's girlfriend. She stated that she had also met Davidson through Cobbins during a trip to Knoxville.

Ms. Hays testified that in mid-December 2006, she, Joshua Johnson, "Lauren," and Cobbins drove to Knoxville in "Lauren's" car, and the Defendant and Ms. Lawson drove in Ms. Lawson's car. They stayed with Davidson at 2316 Chipman Street. She said they stayed several days, during which they helped to move a woman that Davidson and Cobbins referred to as "aunt," Ethel Lynn Freeman. After staying several days, Ms. Hays returned to Lebanon, Kentucky, in Ms. Lawson's car with Ms. Lawson, Cobbins, and the Defendant. Ms. Hays said that, after Christmas, Coleman, Cobbins, the Defendant, and Ms. Lawson made another trip to Knoxville; however, she stayed in Kentucky during this trip. She said Ms. Lawson returned from the trip alone, and the others returned from Knoxville on a Tuesday in January. Ms. Hays recalled that she was asleep on the couch when she heard banging on the window and door. She opened the door, and the Defendant, Cobbins, and Coleman entered with their belongings stating that the "move didn't work out."

Ms. Hays testified that, on the following day, Wednesday, January 10, 2007, Ms.

20

Lawson came to Ms. Hays's house to see the Defendant. Ms. Hays stated that she kept her computer upstairs, and the Defendant had asked if he could use her computer to "look up some of his family in Detroit." She said she allowed him to use the computer and went back downstairs. She stated that she was unaware of what occurred after that because she was "on medicine" and "had company over."

Ms. Hays testified that one evening, while sitting at her kitchen table with the Defendant, she saw that he held in his hand some coins and "small" bullets. She asked him what the items were and "he didn't really answer," putting them back in his pocket. She described the bullets as the "smallest" she had ever seen.

Ms. Hays testified that, on Thursday, January 11, 2007, she received a telephone call ordering her to exit her house. She went outside to find "cops and more cops." She was placed in a patrol car across the street and eventually taken to the Lebanon Police Department. Once she returned home, a friend came over to help her clean her house, and her friend found a silver revolver in a box. Ms. Hays stated that she had never seen the gun before, and her friend turned the gun over to the police.

On cross-examination, Ms. Hays testified that at the time of these events she was on a medication that made her feel "dizzy and all kinds of things." She stated that, while staying at the house at 2316 Chipman Street in Knoxville, Tennessee, she did not notice any bullets lying around the house. She explained that she is "not observant like that." Ms. Hays stated that the gun in her house was found in the room where Cobbins and Coleman slept.

Bernard Waggoner, a Bureau of Alcohol, Tobacco, Firearms and Explosives Special Agent, testified that he participated in the apprehension of suspects related to this case. Agent Waggoner traveled to Lebanon, Kentucky, and made contact with Stacy Lawson on the morning of Thursday, January 11, 2007, and she provided the 231 Shuck Avenue address of Natosha Hays. Law enforcement officers from several agencies went to 231 Shuck Avenue and advised Ms. Hays of the police presence and that everyone should come out of the house with their hands up. Initially, Ms. Hays and Coleman exited, then Cobbins came out of the house with his hands up. Law enforcement observed someone looking out of the blinds of the upstairs bedroom window. One of the females advised officers that the Defendant was still inside. Agent Waggoner, along with other officers, entered the house and yelled several times for the Defendant to come downstairs with his hands displayed, and the Defendant complied.

Agent Waggoner testified that he participated in the search of the Shuck Avenue residence and that a gun was not found. On the following day, January 12, 2007, he received a call from the Kentucky State Police advising that Natosha Hays had turned over a .22

21

caliber revolver to the police. She stated that she found it while cleaning her house after the defendants were taken into custody.

Agent Waggoner testified that he also participated in a search of 2316 Chipman Street on January 15, 2007. He stated that he collected C.C.'s pink shoes from the back bedroom closet of the residence. He also collected a bleach bottle found in the kitchen. While searching the residence, Agent Waggoner observed two bullet holes in the wall and ceiling. He believed the bullet hole in the living room wall to be a .22 bullet hole, and he described the bullet hole in the ceiling as a "larger diameter bullet hole."

On cross-examination, Agent Waggoner stated that his search of Ms. Hays's residence indicated that the Defendant had slept in the upstairs bedroom with Ms. Hays the night before. The firearm was found in the room occupied by Coleman and Cobbins.

Nevil Norman, a Knox County Sheriff's Department homicide detective, testified that on Thursday, January 11, 2007, the Sheriff informed him that he was going to Lebanon, Kentucky, to take three murder suspects into custody. Detective Norman said that the previous weekend he had taken the initial report of a missing person associated with this case and had approved a "BOLO" (Be On the Look Out) for C.C.'s license number. Detective Norman's specific role in the arrest of the Defendant, Cobbins, and Coleman was to watch the back of the house while other officers took the suspects into custody. After the suspects were taken into custody, Detective Norman returned to the Lebanon Police Department and participated in the interviews of the suspects.

Detective Norman testified that the Defendant was the last suspect interviewed at approximately 5:00 p.m. on January 11, 2007. The recorded interview took place in the squad room with Detective Norman, Chief J.J. Jones, and Sheriff Tim Hutchison, who was "in and out" of the room during the interview. At the beginning of the interview, Detective Norman advised the Defendant of his rights, and the Defendant signed a waiver of his rights. The State played the audio recording of the interview for the jury and provided a transcript of the recording.

On the recording, the Defendant stated that he, Coleman, Cobbins, Ms. Hays, and Ms. Lawson drove to Knoxville before New Years' Eve and returned to Kentucky on Monday, January 8, 2007. He stated that Ms. Lawson returned to Kentucky before the rest of the group. The Defendant stated that he could not remember details of those days because he "smoke[d] weed." During the time he was in Knoxville, he said that he stayed at 2316 Chipman Street and at Vince Wernimont's house. He described Vince Wernimont's house as within walking distance of 2316 Chipman Street but far enough away that one might prefer to drive.

22

During the recorded interview, the Defendant told the detectives that Cobbins had told him about Davidson's plan to carjack someone before the men left to commit the carjacking. The Defendant stated that Davidson, "E," and Cobbins left while he was asleep at around 5:00 p.m. on January 6, 2007. The men returned in an SUV with "a white guy and a white girl with them and they had blindfolds over their eyes and their hands was tied." The Defendant described the SUV as "a nice little ride" and stated that he put "two and two together in [his] head" when he saw C.C. and C.N. C.C. and C.N. were brought inside the house, and C.C. was taken into Davidson's bedroom. The Defendant said that, while this was occurring, he thought, "You all are really tripping now," so he went into the back bedroom and listened to the radio and smoked marijuana. While he was in the back bedroom, he believed that "E" and Davidson left the house.

The Defendant agreed that he was in the living room "at certain times" while the victims were present in the house. He explained, "Yeah cause I mean ain't too many places you can be sitting inside the house. . . . It's just basically four rooms." The Defendant stated that, after the victims arrived, he left the house to go to the store "a couple of good times," and then he, Cobbins, and Coleman walked to Vince Wernimont's house. He said that neither Davidson nor "E" were at the Chipman Street house when the three left for Vince Wernimont's house.

During the interview the Defendant agreed that he rode in C.C.'s 4Runner but stated that he never drove it. The Defendant stated that he never returned to the house at 2316 Chipman Street and he denied any knowledge of what occurred there. The detectives then challenged the Defendant on his evasiveness and failed memory as to the events that occurred after the victims were brought inside 2316 Chipman Street, and the Defendant stated, "Nah, nah, I said I remember it but I'm saying, I ain't, I mean I, I wasn't, right then and there I wasn't paying too much attention but of course I was paying attention."

The detectives then questioned the Defendant again about what occurred after the victims were brought inside the house. He said that C.C. was taken to the bedroom and that "E" and Mr. Cobbins took C.N. "outside" or "out back." He said that C.C. was in the bedroom alone at this point and that he went to the back room to smoke a "blunt" and listen to the radio. He later stated that just "E" walked C.N. outside. He then clarified that "E," who had a gun, and C.N. left in a car. He said that "E" returned alone twenty to thirty minutes later.

The Defendant then recounted the victims' entrance into the house, saying that everyone engaged in a discussion about "the whole thing," and that the Defendant, Cobbins, and Coleman decided they should leave 2316 Chipman Street. Davidson then gave the Defendant, Cobbins, and Coleman "a ride." The Defendant was unsure of whether C.C. was

alone in the house at this time. The following day, Sunday, January 7, 2007, he returned to gather his belongings and then left again.

The Defendant recalled Ms. Sutton coming over to the house at 2316 Chipman Street on Sunday, January 7, 2007, to retrieve her belongings, and Davidson giving her a bag of clothing. He denied any knowledge of the origins of the clothing. The Defendant agreed that he watched the news reports on these crimes on Ms. Hays's computer in Lebanon, Kentucky. He denied having sex with C.C., asserting that, despite his patchy memory of the events, he would "know" if he had sex with someone. The Defendant agreed that he saw a pistol and a rifle in the house at 2316 Chipman Street. About "E" leaving with C.N., the Defendant stated, "I kind of figured that he went ahead and did something with the old boy."

The Defendant told the Detectives that the discussion about "the whole thing" occurred after "E" had returned without C.N. at about 9:00 or 10:00 p.m. on Saturday night, January 6, 2007. He recalled that, during the discussion, C.C. was sitting by herself, tied up, in Davidson's bedroom. He said that, after the discussion, "we jumped into the, uh, the car, and uh, we went over, uh, we went a couple of places." He said that one of the "places" they went in the 4Runner was to the apartment of Ms. Suttles and Ms. Pressley, Ms. Sutton's friends.

The Defendant maintained that he never had sex with C.C. and stated that he did not recall ever hearing the victim "hollering" inside Davidson's bedroom because he "wasn't in there with them." The Defendant reiterated that he spent the remainder of the night at Vince Wernimont's house on Saturday night, January 6, 2007, into Sunday morning, January 7, 2007. When he returned to gather his belongings from the Chipman Street house on Sunday, he found no one there.

The Defendant agreed that he was in the back bedroom after the victims arrived at the house but clarified that he slept in the living room, the room right next to where C.C. was kept. Even though he was in close proximity to C.C., he maintained, "I didn't hear old girl hollering," possibly because he "sleep[s] hard."

Detective Norman testified about an unrecorded conversation with the Defendant that occurred after the conclusion of the interview as follows:

> [W]hen we finished the interview, Chief Jones had [gone to get] a cigarette for [the Defendant]. And I was putting up my equipment and put the tapes up and Mr. Jones had left the room and left [the Defendant] and myself in the room. And I went up to [the Defendant] after I finished putting up my stuff and I said, Should you not have called someone about what happened out

24

on Chipman Street?  And [the Defendant] looked me straight in the eye and said, ["]Fuck that white girl.  She didn't mean anything to me.  You cops come into our neighborhood and kill us, so why should I get involved with something that's none of my business?["]

When asked if he responded to the Defendant, Detective Norman said that he stated, "Because it was the right thing to do," and then Agent Waggoner entered and escorted the Defendant outside.  This was Detective Norman's last conversation with the Defendant.  He said that he did not include this interaction in his notes until over a year later.  Detective Norman said that, when preparing for a hearing, he mentioned this interaction with the Defendant to an assistant district attorney who requested that he document the exchange.

On cross-examination, Detective Norman agreed that during the interview it was he and Chief Jones who referenced C.C. and C.N. as "the white girl," and "the white boy," not the Defendant.  He also agreed that the only use of curse words during the taped interview are by him and Chief Jones, not the Defendant.  Detective Norman agreed that it was not until after the recorder was turned off that the Defendant referenced C.C. as a "white girl" and used a curse word.  Detective Norman stated that he spoke with other detectives and his supervisor about the conversation but did not reduce the interaction to writing until June 24, 2008.

Marion Blankenship, employed at the Grayson County Detention Center, testified that she oversaw the daily operations of the facility.  She described for the jury the process that occurred when an inmate made a telephone call from the detention center.  She said that a recording plays each time a call is placed notifying the caller that the call is being monitored and recorded.  The State then played the following portions of a recorded telephone conversation between Ms. Lawson and the Defendant:

Lawson:      What, they said they had her in the back bedroom.

[Defendant]: No, they had her inside, uh,

Lawson:      [Davidson]'s room?

[Defendant]: [Davidson's] room.  'Cause we was, we was in the kitchen and the back bedroom.  And then they tried to say old girl [Ms. Sutton] came through and s**t, which she did come over.  I, yeah, I, I believe she did.

Lawson:      There was a girl there?

25

[Defendant]: I think she, yeah she was.

Lawson: How in the f**k did not, why didn't anybody f**king call? Why didn't you, why didn't somebody leave?

[Defendant]: S**t we did leave!

Lawson: And why didn't nobody f**king call the police and tell them that this s**t was going on?

[Defendant]: Come on now.

Lawson: Somebody should have f**king did that, G.

[Defendant]: Come on now.

Lawson: 'Cause I mean that girl did not deserve the s**t that she was f**king put through.

[Defendant]: Shoulda woulda coulda.

Lawson: Neither did that boy.

[Defendant]: Shoulda woulda coulda.

Lawson: I know.

[Defendant]: Bud didn't, so, you know what I'm saying. I mean it wasn't none of my damn business in the first place.

Lawson: I know.

[Defendant]: That, know what I'm saying? I'm not fixing to sit right there and be, no, that ain't none of my business.

By stipulation of the parties, the prosecutor read portions of letters the Defendant wrote to Cobbins in 2008. The letters address Cobbins either by his nickname, "Rome," or "Bro." The letter dated May 16, 2008, closes with "Brother with love," "it's. . . never too much, Bro!" and "Love, Geovonni." Also in the letter is, "It's love, Bro, even when the world blows." In the second undated letter, "Rome" and on the same line "U.T.G." and then

26

in parenthesis "as always, I'm still living it." The letter ends with "always love, your boy Geovonni," "B.W.L." The letter dated June 11, 2008, addresses Cobbins as "Rome" and "Bro!" and concludes with "never too much love, G," "United ToGether," "Brother With Love."

Jennifer Millsaps[4], a TBI forensic scientist assigned to the serology and DNA unit, testified as an expert in the field of forensic serology. Agent Millsaps found the presence of spermatozoa in vaginal and anal swabs taken from C.C.. The vaginal swab contained a mixture of genetic material matching C.C. and Davidson's DNA profiles and the anal swab contained profiles consistent with C.C. and Davidson's DNA profiles. The oral swab contained the presence of semen but not spermatozoa, and the DNA profile was consistent with a mixture of genetic material containing a profile that matched C.C. and a profile that was consistent with Cobbins.

Agent Millsaps testified that she also analyzed a rectal swab obtained from C.N. The examination revealed the presence of semen, but not spermatozoa and no DNA profile, other than C.N.'s, was obtained. Agent Millsaps explained that there must be a presence of spermatozoa, skin, or white blood cells, in order to find a DNA profile.

Agent Millsaps testified that she analyzed two stains on the white camisole C.C. was found wearing and found the presence of spermatozoa. Both stains contained a DNA profile that matched or was consistent with C.C.'s and Cobbins's profiles. Two stains on the striped sweater worn by C.C. were analyzed and revealed the presence of spermatozoa. The first stain revealed genetic material consistent with the DNA profiles of C.C. and Cobbins. The second stain contained a DNA profile consistent with C.C. and inconclusive as to a second contributor to the genetic material.

Agent Millsaps testified that she also examined the floral fabric collected during the autopsy of C.C., and determined that it had several stains containing spermatozoa. Two of the stains contained the DNA of Coleman and Cobbins. Another stain contained DNA from an unidentifiable female and Cobbins. A fourth stain also contained spermatozoa and the DNA of C.C., Coleman, and Cobbins. Agent Millsaps stated that she examined C.C.'s jeans, collected from the utility room at 2316 Chipman Street, which contained the DNA of Cobbins and Davidson's and C.C.'s blood. Her examination of cuttings from an inflatable bed recovered from the residence contained blood and spermatozoa and the DNA of Davidson and Ms. Sutton. One of the pieces of the inflatable bed contained spermatozoa and DNA of C.C. and an unidentifiable person. Agent Millsaps also tested a white cloth strip

---

[4]By agreement of the parties, Jennifer Millsap's testimony from a prior hearing was read into evidence at trial.

from a gray purse. One section had a mixture of DNA from Coleman and C.C. Another section had the DNA of C.C. and other unidentifiable persons. Two other sections contained DNA of C.C., Davidson, and Ms. Sutton.

Dr. Darinka Mileusnic-Polchan, Chief Medical Examiner for Knox and Anderson Counties, testified as an expert witness in the field of forensic and anatomic pathology. She stated that she was a forensic scientist who determined the cause and manner of death in cases when the death was sudden, unexpected, without medical attendance or due to violence. Dr. Mileusnic-Polchan stated that she conducted "the postmortem exam, or autopsy" on C.N. Dr. Mileusnic-Polchan testified that ligatures were found on C.N.'s wrists and ankles, and a blindfold and gag were also present on the body. She described the fire injury to C.N.'s body as "gradual" ranging from "a really heavily involved area to slightly less dense and then area of sparing." She explained this was likely due to remnants of clothing, such as a sweatshirt covering C.N.'s head, the blindfold, and gag, which attracted more fire and elicited more burning than the lower part of the unclothed body. She referenced a comforter that was used as a "shroud" around the body. She said fragments of the comforter recovered emanated a "gasoline-like odor."

Dr. Mileusnic-Polchan testified that there was a leather belt binding C.N.'s ankles and a torn piece of bed sheet underneath the belt restraining C.N.'s ankles. She stated that the dirt and mud found on the soles of C.N.'s feet indicated that he walked barefoot on muddy ground to be taken to the site where he was eventually shot. Dr. Mileusnic-Polchan described the sweatshirt as "heavy" and completely encircling C.N.'s head "in a couple of layers." The sweatshirt was secured around C.N.'s neck with the strings of the hood portion of the sweatshirt. Dr. Mileusnic-Polchan noted a defect in the sweatshirt indicating that C.N. was shot through the sweatshirt. After removal of the sweatshirt, Dr. Mileusnic-Polchan found a gunshot wound to the right side of C.N.'s head just above the ear. Also revealed was a blood-stained bandana, used as a blindfold, and a blood-stained sock shoved into C.N.'s mouth as a gag and secured to C.N.'s lower face with shoelaces.

Dr. Mileusnic-Polchan testified that the area around the gunshot wound to the head was consistent with a "very close range" or contact gunshot wound. The bullet entered the parietal temporal area above the ear and went through the right hemisphere of the brain and then steeply down, involving the brain stem. She stated that injury with brain stem involvement results in a "very quick death." The lead bullet was recovered from the base of C.N.'s skull. Dr. Mileusnic-Polchan found another gunshot wound in the area where the neck and shoulder meet. She explained that this wound would not necessarily have caused death but due to the damage to major vessels in that area, the injury would have caused "some sort of disability." She could not determine the range of firing for this gunshot wound. A third gunshot wound was found on C.N.'s left lumbar area. Dr. Mileusnic-

28

Polchan could not estimate the contact range due to the heavy fire damage to this area of C.N.'s body. The bullet for this wound involved back muscle and severed the spinal cord. This injury would have disabled C.N. and caused him to lose control of his lower extremities.

Dr. Mileusnic-Polchan testified that C.N.'s anal area was bruised and damaged, consistent with injury sustained from a blunt object being forced inside his anus. Based upon the tissue reaction to the damage, Dr. Mileusnic-Polchan estimated that the injuries to his anus occurred "a couple of hours" before his death. Dr. Mileusnic-Polchan testified that, based upon the gunshot wounds, it was likely that C.N. was first shot in the neck, causing him to fall to the ground and injure his forehead. He was then shot in the back and finally shot in the head, which killed him. Dr. Mileusnic-Polchan stated that the blindfold and head wrapping were placed on C.N. before the shooting. She stated that the final event was the suspects setting C.N. on fire. Based upon the carbon monoxide level in C.N.'s blood and the lack of soot on C.N.'s upper airway, Dr. Mileusnic-Polchan determined that C.N. was dead at the time he was set on fire.

Dr. Mileusnic-Polchan testified that her findings were consistent with C.N. being bent over after suffering a gunshot wound to his lower back, then suffering a gunshot wound to his shoulder area, before sustaining the fatal contact wound to his head. Due to the absence of C.N.'s blood anywhere other than on the items surrounding his head, and no evidence of the body being dragged at the scene, Dr. Mileusnic-Polchan stated it was likely C.N. was shot where his body was found. Dr. Mileusnic-Polchan testified that C.N.'s body was discovered on Sunday, January 7, 2007, and she conducted the autopsy the following day, January 8, 2007. She noted that there was no indication of postmortem autolysis or decomposition, indicating that C.N.'s death occurred within twelve hours of discovery.

Dr. Mileusnic-Polchan testified that she also performed C.C.'s autopsy. She explained that C.C.'s body was discovered on Tuesday, January 9, 2007, the day after she had concluded C.N.'s autopsy. In concert with law enforcement, who believed the two deaths might be related, she went to the scene to view C.C.'s body in the context of the crime scene. Dr. Mileusnic-Polchan described the residence at 2316 Chipman Street as "relatively small" with all of the doorways inside "wide open." She said that in the far corner of the kitchen there was a dark blue trash bin. Once the police officers lifted the lid, it was clear that there was a human body inside. She said that the body was deformed "of course because you have an adult person now stuffed, really, in this bin." The shoulder area was visible but the body was inside five different large garbage bags and then placed inside the trash bin. On top of the body were various pieces of bedding and curtain. In the interest of preserving the evidence, it was determined that the body should be transported as it was found, inside the trash bin. The lid was replaced, the trash bin was placed in a tarp, and then transported to the Medical Examiner's office.

29

Dr. Mileusnic-Polchan testified that, once C.C.'s body was at the Medical Examiner's office, she went "layer by layer . . . all the way to the body to record everything that was on the body present and around the body." She described a white bag that was covering C.C.'s face and tied behind the back of her head. She also found several different ligatures used to tie C.C. in a "fetal-like position" in order to fit her inside the bin. Dr. Mileusnic-Polchan stated that both the bag tied around C.C.'s face and the fetal position would be "very detrimental" to C.C.'s ability to breathe, leading to asphyxiation. The third component contributing to asphyxia was the items placed on top of C.C. and the lid on top of the bin, which she referred to as confined space asphyxia. Dr. Mileusnic-Polchan stated that all of these factors contributed to C.C.'s inability to breathe. Dr. Mileusnic-Polchan showed the jury a photograph of a ligature found around C.C.'s neck that contained a "triple knot."

Dr. Mileusnic-Polchan testified that C.C.'s body was unclothed except for a striped sweater with a white camisole underneath. Dr. Mileusnic-Polchan found a ligature of semi-sheer curtain-like material used to bring C.C.'s knees to her chin and another ligature made out of thicker, denser material, such as a curtain or bed cover, used to force C.C.'s thighs against her belly to force her into a fetal position. The semi-sheer curtain was also used to bind C.C.'s ankles. The ligatures forced C.C.'s knee into C.C.'s left cheek.

Dr. Mileusnic-Polchan testified that the lividity, or settling of the blood in the body after death, and the unusual pattern of skin detachment indicated that C.C. had been in the bin for longer than twenty-four hours. Dr. Mileusnic also noticed a "strange" odor emanating from the body, one she described as a chemical odor that altered the odor consistent with human decomposition. Dr. Mileusnic-Polchan observed a pressure mark on the left side of C.C.'s face from her head being pressed against her knee inside the trash bin. She noted that C.C.'s eyes remained open and had grey discoloration that can be found in deaths involving a "slow dying process." There was injury, an abrasion or "deep scrape," to C.C.'s upper inside lip, consistent with forceful entry of an object into the mouth. Dr. Mileusnic-Polchan said that she did not find any evidence of defensive injuries on C.C.

Dr. Mileusnic-Polchan testified that C.C.'s anus had a lot of bruising and swelling as well as some tearing. The vaginal area also had tearing with a "tremendous amount" of bruising and abrasions. About the bruising, Dr. Mileusnic-Polchan stated:

> [T]his is not just any bruise, this is actually associated with the so-called hematoma. Meaning, that if I - - when I made the cut into the tissue, there was actually a solid blood clot under the skin since there was tremendous bleeding in the tissue under the skin.

She stated that this type of injury indicates "heavy" blunt force injuries more severe than that

30

found with a "regular rape situation." The damage to C.C.'s vaginal area was more consistent with being caused by an object rather than a penis. The injuries to C.C.'s anus were also consistent with an object being forced in and out of the anus due to the significant tearing in the area.

Dr. Mileusnic-Polchan testified that she found areas of bruising under C.C.'s scalp that indicated a "couple of substantial hits" to the head causing blunt force trauma. Areas consistent with carpet burn were found on the lower back and bruising under the skin on the upper back area. On both of C.C.'s arms there was bruising associated with being forcefully grabbed on the arms.

Dr. Mileusnic-Polchan testified that C.C.'s cause of death was asphyxia from a combination of the plastic bag tied around her face, her position in the garbage bin, and the closed bin and materials placed on top of her. The manner of death was homicide. Dr. Mileusnic-Polchan testified that C.N.'s cause of death was multiple gunshot wounds and the manner of death was homicide.

Dr. Mileusnic-Polchan testified that, based upon her findings, it is likely that C.C. died at some time between late Sunday afternoon, January 7, 2007, and early Monday morning, January 8, 2007. She stated that her findings were consistent with C.N.'s death occurring at around 1:45 a.m. on Sunday, January 7, 2007.

Based upon this evidence, the jury convicted the Defendant on all thirty-eight counts. It is from these judgments that the Defendant now appeals.

## II. Analysis

The Defendant asserts that: (1) the trial court erred when it denied his motion to suppress his statements; (2) the trial court improperly admitted an "unreliable unrecorded statement attributed by law enforcement to [the Defendant];" (3) the criminal responsibility statute is void for vagueness; (4) the trial court erred when it retroactively applied the *Dorantes* evidentiary standard pertaining to circumstantial evidence; (5) the presentment was insufficient for failure to charge criminal responsibility; and (6) the evidence is insufficient to sustain his convictions. The State asks us to affirm the trial court in all respects. We now address each of the Defendant's issues in turn.

### A. Motion to Suppress

The Defendant argues that there was insufficient probable cause to support his warrantless arrest, thereby requiring suppression of his post-arrest statements. The State

responds that law enforcement officers possessed ample probable cause that the Defendant was committing or had committed a felony at the time of the Defendant's arrest. We agree with the State.

Our standard of review for a trial court's findings of fact and conclusions of law on a motion to suppress evidence is set forth in *State v. Odom*, 928 S.W.2d 18 (Tenn. 1996). Under this standard, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." *Id*. at 23. As is customary, "[t]he prevailing party in the trial court is afforded the 'strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence.'" *State v. Carter*, 16 S.W.3d 762, 765 (Tenn. 2000) (quoting *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998)). Nevertheless, this Court reviews *de novo* the trial court's application of the law to the facts, without according any presumption of correctness to those conclusions. *See State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001); *State v. Crutcher*, 989 S.W.2d 295, 299 (Tenn. 1999). The trial court, as the trier of fact, is able to assess the credibility of the witnesses, determine the weight and value to be afforded the evidence, and resolve any conflicts in the evidence. *Odom*, 928 S.W.2d at 23. In reviewing a trial court's ruling on a motion to suppress, an appellate court may consider the evidence presented both at the suppression hearing and at the subsequent trial. *State v. Henning*, 975 S.W.2d 290, 299 (Tenn. 1998).

The Defendant was arrested without a warrant shortly after noon on January 11, 2007, at the residence of Natosha Hays on Shuck Avenue in Lebanon, Kentucky. The State asserted at the suppression hearing that probable cause for the arrest existed at the time of the arrest. In support of this assertion, the State presented Bernard Waggoner, a Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") special agent, who testified about his involvement in the Defendant's arrest. Agent Waggoner became involved with the federal investigation of the carjacking related to this case on the afternoon of Wednesday, January 10, 2007. The ATF also played a role in assisting in the state investigation of the victims' murders. Agent Waggoner stated that, on January 10, 2007, he was briefed about the investigation and potential suspects in this case, including the Defendant. That same day he traveled to Kentucky with Steve Cordle, his supervisor, for the purpose of locating the suspects. The two officers spent the night in an adjacent county, and then proceeded to the Lebanon Police Department in Lebanon, Kentucky on the morning of January 11, 2007.

Agent Waggoner was present at the January 11, 2007 briefing meeting at the Lebanon Police Department, along with members of the local police, the local sheriff's office, drug task force agents, deputy U.S. Marshals and members of the Knox County Sheriff's Department. During the briefing meeting, the facts and circumstances known at the time about the carjacking, murders, and the suspects in the case, including the Defendant, were

32

discussed. Stacy Lawson, already known to Agent Waggoner, was identified as the Defendant's girlfriend, and a state trooper provided the location of her residence. Agent Waggoner stated that, in addition to her address, he was also aware that she drove a four-door, green Pontiac Grand Am and that Ms. Lawson was a "heavy-set white female." Agent Waggoner rode with a state trooper to Ms. Lawson's address to see if they could locate the suspects. As they approached the residence, Agent Waggoner observed Ms. Lawson pulling out of her driveway. Ms. Lawson was stopped and informed about the investigation of the carjacking and murders that had occurred in Knoxville, Tennessee. Agent Waggoner told Ms. Lawson that he was looking for Cobbins, Davidson, the Defendant, and Coleman.

Initially, Ms. Lawson denied any knowledge or involvement with the crimes, but she gave consent for law enforcement officers to search her house. Law enforcement did not find any of the suspects there. Ms. Lawson identified herself as the Defendant's girlfriend and eventually told the officers that the Defendant, Cobbins, and Coleman were in Lebanon, Kentucky, staying at Ms. Hays's residence located on Shuck Avenue. Ms. Lawson stated that, at the time she was stopped by law enforcement, she was en route to pick up the suspects and transport them to an unknown location out of town. Ms. Lawson was taken to the police department, and the other investigators were updated on the interaction with and information provided by Ms. Lawson. Agent Waggoner stated that there was concern among the investigators that the suspects might flee if Ms. Lawson failed to arrive at Ms. Hays's house as planned.

Ms. Lawson had advised Agent Waggoner that Ms. Hays might also be dating the Defendant and that Ms. Hays would be present in the house along with the Defendant, Coleman, and Cobbins. Ms. Lawson told law enforcement officers that she did not believe that the Defendant "would be involved in something like this," but she confirmed that the Defendant had remained at the Chipman Street house after Ms. Lawson returned to Kentucky on January 5, 2007.

After a plan was devised to execute the arrest of the suspects, law enforcement officers surrounded Ms. Hays's house at around noon on January 11, 2007, and then a telephone call was placed to Ms. Hays. Ms. Hays was advised that the police were outside her house and for everyone inside to come out with their hands raised. When no one exited the house, a PA system was used to announce that everyone in the house should exit with their hands raised. A female looked out the "front door glass" and then turned around and stepped back inside before two females, Ms. Hays and Coleman, exited the house and were taken into custody. Cobbins then exited the house with his hands raised and was also taken into custody. While this was occurring, law enforcement observed "someone peeking out of the blinds upstairs." Ms. Hays told law enforcement that it was the Defendant. Agent Waggoner described Ms. Hays as cooperative throughout the entire incident.

33

Agent Waggoner testified that he, along with several other deputy U.S. Marshals, ATF agents, and police officers made entry into Ms. Hays's residence and secured the ground level of the residence. He explained that he did so at the instruction of his supervisor, Steve Cordle, who was "in charge." He stated that it was his understanding that Ms. Hays "let us" go into the house, and she also later signed a consent to search the residence for evidence. Upon entering the house, Agent Waggoner could hear the Defendant moving around upstairs, so an officer announced the police presence and asked the Defendant to come downstairs with his hands raised. Initially, the Defendant did not come downstairs and "made statements as if he was asleep and didn't know what was going on." After the second or third order for him to come downstairs, the Defendant complied and was taken into custody without incident.

Agent Waggoner acknowledged that the Defendant's arrest was a warrantless arrest, but he explained that law enforcement had probable cause that the Defendant had committed or been part of the commission of the carjacking, kidnapping, and murders of the victims. Agent Waggoner said that the Defendant had been identified as a suspect and that Agent Waggoner had seen the Defendant's criminal record. Agent Waggoner stated that, at the time of the Defendant's warrantless arrest, Agent Waggoner was aware that C.C.'s body had been found inside the house at 2316 Chipman Street and that the Defendant had been present at the house during the time of the offenses. Agent Waggoner explained that, after speaking with Ms. Lawson, a federal warrant was not pursued due to the delay it would require and concern regarding the suspects' intent to flee. Agent Waggoner further explained that Ms. Lawson's failure to arrive at Ms. Hays's house as planned would likely alert the suspects to the police activity, so the officers needed to take action expediently. Agent Waggoner testified that the Defendant was charged with a federal carjacking-related offense at around 11:30 p.m. on the night of January 11, 2007.

Rebecca Bobich, an ATF agent, was also involved in the federal investigation of the carjacking in this case. She remained in Knoxville to continue coordinating investigation efforts while other ATF agents went to Kentucky to attempt to locate the suspects. She said that she was in telephone communication with Steve Cordle, her supervisor, during this time to relay information recovered during the ongoing investigation. She stated that on January 10, 2007, she confirmed that it was the Defendant who had checked out the DVDs found on January 9, 2007, in the house at 2316 Chipman Street, and she relayed this information to Steve Cordle.

Robert Sexton, Jr., the Knox County Sheriff's Office assistant chief deputy, testified that at about 10:30 a.m. on January 11, 2007, at the request of Sheriff Hutchison, he took a Defendant's driver's license photograph to Ms. Sutton, who identified the Defendant as the person who had been at the 2316 Chipman Street residence on Sunday night, January 7,

34

2007. Deputy Sexton then called Sheriff Hutchison, who was in Kentucky, and told him that Ms. Sutton had confirmed that the Defendant was present in the Chipman Street residence on January 7, 2007.

Ryan Flores, a Knoxville Police Department officer, interviewed Ms. Sutton on Wednesday, January 10, 2007. During this interview, Ms. Sutton stated that she had dated Davidson and lived at 2316 Chipman Street until December 27 or 28, 2006, when she moved out due to an altercation with Davidson. She stated that she had some contact with Davidson until January 9, 2007. She had returned to 2316 Chipman Street on Sunday, January 7, 2007, after Davidson had called to tell her he had some clothing for her. She said that Davidson, Cobbins, Coleman, and the Defendant were all at the house when she arrived. Ms. Sutton stated that Cobbins, Coleman, and the Defendant were all "from Kentucky." Officer Flores stated that this information was shared with other law enforcement officers and agencies following the interview.

The trial court later issued an order with the following findings:

ATF Agents Bernard Waggoner and Rebecca Bobich, Knoxville Police Department (KPD) Investigator Ryan Flores, and Knox County Sheriff's Department (KCSD) Detective Robert Sexton all credibly testified concerning the initial investigation into suspects, when authorities located the Defendant in Lebanon, Kentucky, transported the Defendant to the Lebanon Police Department, and the Defendant's waiver of rights and statement given.

. . . .

Agent Waggoner testified that his supervisor, Agent Cordle, was in charge the day of the arrest. Agent Bobich testified that she had been in contact with Cordle throughout the day and that they had possessed the information that Sutton had identified Thomas as having been at the Chipman Street residence where the female victim's body had been located, and that three DVDs found at the Chipman Street residence had been verified as having been checked out of the Marion County, Kentucky Library to Defendant Thomas. The agents were also aware that the male victim's body had been found on Sunday (the same day the Defendant had been seen by Sutton) within a short distance of the Chipman Street residence, the female victim's 4-runner had been located near the Chipman Street residence, Defendant Thomas' girlfriend, Stacy Lawson, indicated that Thomas had been at the residence with the other suspects, and that Lawson had been on her way to transport Thomas, Cobbins, and Coleman out of town to an unknown location, that morning.

35

Based upon the facts and circumstances known to officers at the time of arrest, this Court finds that there was sufficient probable cause to support the warrantless arrest of the Defendant.

(Footnote omitted).

The evidence does not preponderate against the trial court's finding that law enforcement officers had probable cause to arrest the Defendant on January 11, 2007, at Ms. Hays's house. Tennessee Code Annotated § 40-7-103(a)(3) provides that an officer may make a warrantless arrest "[w]hen a felony has in fact been committed, and the officer has reasonable cause for believing the person arrested to have committed it." Tennessee courts "make little, if any, distinction between the terms 'reasonable cause' and 'probable cause' in determining whether there exists a basis for an arrest." *State v. Herbert Lee Massey*, C.C.A.# 01C01-9406-CR-00218, 1995 WL 518872, at *4 (Tenn. Crim. App., at Nashville, Sept. 5, 1995), *no Tenn. R. App. P. 11 filed* (citing *State v. Melson*, 638 S.W.2d 342, 350 (Tenn. 1982)). Probable cause for a warrantless arrest "exists if, at the time of the arrest, the facts and circumstances within the knowledge of the officers, and of which they had reasonably trustworthy information, are 'sufficient to warrant a prudent [person] in believing that the [individual] had committed or was committing an offense." *State v. Bridges*, 963 S.W.2d 487, 491 (Tenn. 1997) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). Our Courts have also stated that probable cause may rest upon many factors, one of which is identification of the defendant at the scene when the offenses were committed. *State v. Lawrence*, 154 S.W.3d 71, 76 (Tenn. 2005); *State v. Claybrook*, 736 S.W.2d 95, 102 (Tenn. 1987).

When determining whether the police possessed probable cause, "the courts should consider the collective knowledge that law enforcement possessed at the time of the arrest, provided that a sufficient nexus of communication existed between the arresting officer and any other officer or officers who possessed relevant information." *State v. Bishop*, 431 S.W.3d 22, 36 (Tenn. 2014). Such a nexus exists when the officers are relaying information or when one officer directs another officer to act. *Id*. It matters not whether the arresting officers themselves believed that probable cause existed. *Id*. (citing *State v. Huddleston*, 924 S.W.2d 666, 676 (Tenn. 19967)("[An officer's] subjective belief that he did not have enough evidence to obtain a warrant is irrelevant to whether or not probable cause actually existed.")). When determining the existence of probable cause, the courts should also consider the entire record, including the proof adduced at both the suppression hearing and the trial. *Id*. at 36-37 (citing *Henning*, 975 S.W.2d at 299.

In this case, law enforcement officers working in concert on this investigation knew that: (1) C.C. and C.N. were last seen on Saturday night, January 6, 2007; (2) C.N.'s body

had been discovered on Sunday morning, January 7, 2007, by the railroad tracks between 150 and 200 yards from 2316 Chipman Street; (3) C.N.'s body was burned and he had sustained three bullet wounds to his body and was estimated to have been killed around 1:00 a.m. January 7, 2007; (4) C.C.'s 4Runner, which had been altered, was recovered Sunday night within two blocks of 2316 Chipman Street; (5) C.C.'s body was found on January 9, 2007, stuffed into a trash can in the kitchen of 2316 Chipman Street; (6) the same bedding material was used to bind both C.C. and C.N.; (7) C.C. died between late afternoon on January 7, 2007, to early Monday morning, January 8, 2007; (8) the Chipman Street house was small and had no doors between the "rooms" inside; (9) law enforcement officers observed bullet holes in the wall and ceiling of the living room and found a box of .22 caliber cartridges, a rifle, and a gas can inside the residence; (10) police officers found three DVDs inside the house all checked out by the Defendant from the Marion County Public Library in Lebanon, Kentucky; (11) the Defendant was present at 2316 Chipman Street at the time of the offenses; (12) Ms. Sutton had identified a photograph of the Defendant, confirming that he was the person she saw sitting in the living room on Sunday evening, January 7, 2007, when Ms. Sutton came to the residence at 2316 Chipman Street; (12) the Defendant left 2316 Chipman Street and fled to Kentucky where he was hiding in Ms. Hays's residence; (13) on Thursday morning, January 11, 2007, the Defendant was waiting for Ms. Lawson to pick him up and drive him out of town; (14) the Defendant refused to comply with law enforcement officers' repeated requests that he exit Ms. Hays's residence; and (15) law enforcement officers possessed the Defendant's photograph, biographical information, and NCIC criminal history. Based on the foregoing facts, we conclude that "at the time of the arrest, the facts and circumstances within the knowledge of the officers, and of which they had reasonably trustworthy information, [were] sufficient to warrant a prudent person in believing" that the Defendant was involved in the carjacking, kidnapping, rape, and murder of the victims. *Echols*, 382 S.W.3d at 277-78 (citations omitted) (alterations and internal quotation marks omitted).

The Defendant also claims that the entry into Ms. Hays's residence was unlawful because there was no basis in the absence of a warrant. The State asserts that the Defendant has waived our consideration of this issue for failure to raise it in his second motion to suppress. The State further argues that the Defendant failed to offer any proof during the suppression hearing that he had a legitimate expectation of privacy in Ms. Hays's home and, therefore, has standing to challenge the entry. We agree with the State. Furthermore, we note that Agent Waggoner testified that Ms. Hays provided consent to enter her residence after the Defendant refused to exit Ms. Hays' residence. Accordingly, we conclude that law enforcement officers at Ms. Hays's residence had consent to enter the residence and probable cause to arrest the Defendant for the carjacking, kidnapping, rape, and murder of the victims. The Defendant is not entitled to relief.

## B. Admission into Evidence of the Defendant's Unrecorded Statement to Detective Norman

The Defendant contends that the trial court erred when it admitted into evidence at trial his unrecorded statement made to Detective Norman. The statement was made at the Lebanon Police Department on January 11, 2007, in response to Detective Norman's question, "Should you not have called someone about what happened out on Chipman Street?" The challenged statement is, "F**k that white girl. She didn't mean anything to me. You cops come into our neighborhood and kill us, so why should I get involved with something that's none of my business?" The Defendant asserts that this statement was not relevant, was prejudicial, and failed to comport with the minimum standard of reliability. The State responds that the trial court acted within its discretion in denying the Defendant's motion to exclude the unrecorded statement. We agree with the State.

Initial questions of admissibility of evidence are governed by Tennessee Rules of Evidence 401 and 403. These rules require that the trial court must first determine whether the proffered evidence is relevant. Pursuant to Rule 401, evidence is deemed relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *See State v. Forbes*, 918 S.W.2d 431, 449 (Tenn. Crim. App. 1995) (quoting Tenn. R. Evid. 401). In other words, "evidence is relevant if it helps the trier of fact resolve an issue of fact." NEIL P. COHEN, ET AL., TENNESSEE LAW OF EVIDENCE § 4.01[4], at 4-8 (6th ed. 2011). After the trial court finds that the proffered evidence is relevant, it then weighs the probative value of that evidence against the risk that the evidence will unfairly prejudice the trial. *State v. James*, 81 S.W.3d 751, 757 (Tenn. 2002). If the court finds that the probative value is substantially outweighed by its prejudicial effect, the evidence may be excluded. Tenn. R. Evid. 403. "'Excluding relevant evidence under [Tenn. R. Evid. 403] is an extraordinary remedy that should be used sparingly and persons seeking to exclude otherwise admissible and relevant evidence have a significant burden of persuasion.'" *James*, 81 S.W.3d at 757-58 (quoting *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 227 (Tenn. Ct. App. 1999) (citations omitted)).

"The decision regarding the admissibility of [evidence] pursuant to these Rules lies within the sound discretion of the trial court and will not be overturned on appeal absent a clear showing of an abuse of that discretion." *State v. Young*, 196 S.W.3d 85, 105 (Tenn. 2006) (citing *State v. Banks*, 564 S.W.2d 947, 949 (Tenn. 1978)). "A trial court abuses its discretion only when it applies an incorrect legal standard or makes a ruling that is 'illogical or unreasonable and causes an injustice to the party complaining.'" *State v. Franklin*, 308 S.W.3d 799, 809 (Tenn. 2010) (quoting *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006)).

In denying the Defendant's motion to exclude evidence of his unrecorded statement to Detective Norman, the trial court determined that the statement was relevant because it was an expression of animus toward the victim. The trial court further found that the prejudicial effect of the statement did not substantially outweigh the probative value. Finally, the trial court found that Detective Norman's testimony was not unreliable, concluding that the jury could determine whether the statement was made and "what import should be placed" on the statement within the context of the case. The trial court noted that the defense would have the opportunity to cross-examine Detective Norman about the circumstances surrounding the statement.

Our review of the record reveals that the trial court did not abuse its discretion when it admitted the unrecorded statement. As the trial court correctly noted, the statement revealed the Defendant's animosity toward the victim. Evidence of animus toward a victim is relevant to establish motive in the prosecution of a murder charge. *See State v. Sexton*, 368 S.W.3d 371, 413 (Tenn. 2012). The State's proof regarding the Defendant's statement was through the testimony of the detective to whom the Defendant made the statement. Because the State had the burden of proving the Defendant's involvement in the abuse and murder of C.C., we conclude that the trial court did not err in finding that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice.

As to the Defendant's contention that the testimony was unreliable, this assertion is not supported by the record. Detective Norman testified consistently about the statement throughout these proceedings. We recognize the seventeen-month delay in the documentation of this statement; however, the defense was given ample opportunity to cross-examine Detective Norman about his documentation and effectively did so. Accordingly, the trial court properly exercised its discretion in admitting the unrecorded statement. The Defendant is not entitled to relief.

### C. Criminal Responsibility Statute

The Defendant asserts that Tennessee Code Annotated section 39-11-402 is void for vagueness both facially and as applied. Specifically, the Defendant argues that there is no "meaningful distinction" between the criminal responsibility for conduct of another statute (T.C.A. § 39-11-402) and the criminal responsibility for facilitation of a felony statute (T.C.A. § 39-11-403). He further asserts that any "meaningful difference" between the two statutes has been abrogated by case law on the "natural and probable consequences" doctrine for accomplice liability. The State responds that the criminal responsibility for the conduct of another statute is not unconstitutionally vague. We agree with the State.

The constitutions of the United States and the State of Tennessee guarantee

defendants in all criminal cases due process of law and the right to a fair and impartial jury. *State v. Carruthers*, 35 S.W.3d 516, 559 (Tenn. 2000). When a defendant challenges the constitutionality of a statute, the general principles of statutory construction apply. Appellate courts are charged with upholding the constitutionality of statutes wherever possible. *State v. Lyons*, 802 S.W.2d 590, 592 (Tenn. 1990). In other words, we are required to indulge every presumption and resolve every doubt in favor of the constitutionality of the statute when reviewing a statute for a possible constitutional infirmity. *Id.*; *see also In re Burson*, 909 S.W.2d 768, 775 (Tenn. 1995). Generally, the language of a penal statute must be clear and concise to give adequate warning so that individuals might avoid the prohibited conduct. *See State v. Boyd*, 925 S.W.2d 237, 242-43 (Tenn. Crim. App. 1995). A statute is void for vagueness if it is not "sufficiently precise to put an individual on notice of prohibited activities." *State v. Thomas*, 635 S.W.2d 114, 116 (Tenn. 1982); *see also State v. Wilkins*, 655 S.W.2d 914, 915 (Tenn. 1983), *superseded by statute as stated in State v. Dominy*, 6 S.W.3d 472 (Tenn. 1999). The "void for vagueness" doctrine is based on fairness; it is intended "only to give 'fair warning' of prohibited conduct." *Phillips v. State Bd. of Regents of State Univ. and Cmty.*, 863 S.W.2d 45, 48-49 (Tenn. 1993).

A criminal statute "shall be construed according to the fair import of [its] terms" when determining if it is vague. T.C.A. § 39-11-104. "Due process requires that a statute provide 'fair warning' and prohibits holding an individual criminally liable for conduct that a person of common intelligence would not have reasonably understood to be proscribed." *State v. Burkhart*, 58 S.W.3d 694, 697 (Tenn. 2001) (citing *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972)). Nevertheless, the Tennessee Supreme Court has noted that "absolute precision in drafting prohibitory legislation is not required since prosecution could then easily be evaded by schemes and devices." *Wilkins*, 655 S.W.2d at 916; *see also Burkhart*, 58 S.W.3d at 697; *State v. McDonald*, 534 S.W.2d 650, 651 (Tenn. 1976). To determine whether a statute is unconstitutionally vague, a court should consider whether the statute's prohibitions are not clearly defined and are thus susceptible to different interpretations regarding that which the statute actually proscribes. *State v. Whitehead*, 43 S.W.3d 921, 928 (Tenn. Crim. App. 2000). Therefore, a statute is not unconstitutionally vague "'which by orderly processes of litigation can be rendered sufficiently definite and certain for purposes of judicial decision.'" *Wilkins*, 655 S.W.2d at 91 (quoting *Donathan v. McMinn County*, 213 S.W.2d 173, 176 (1948)).

The criminal responsibility for the conduct of another statute, Tennessee Code Annotated section 39-11-402(2), states in relevant part:

A person is criminally responsible for an offense committed by the conduct of another, if:

. . . .

> (2) Acting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]

We conclude that this statute is sufficiently precise to put a person of common intelligence on notice of the prohibited conduct. The statute intends to assess criminal liability to persons who act together in committing criminal offenses. We also find that it applies to the Defendant's conduct in this case. The proof at trial showed that the Defendant acted in concert with Cobbins and Davidson in perpetrating these offenses and that the Defendant benefitted from the proceeds. On January 6, 2007, no one residing at 2316 Chipman Street had a vehicle. The Defendant was aware of the plan to steal a car and benefitted from his access to the victim's 4Runner for transportation after it was stolen. The Defendant was present and residing at 2316 Chipman Street before, during, and after the offenses. At 2316 Chipman Street, the Defendant also participated in a discussion of what should occur next after the victims, bound and gagged, were brought into the house. The Defendant was present as "E" left with C.N., knowing that he was going to "take care" of the "old boy." The Defendant stayed in the living room of the house, effectively preventing C.C. from exiting the residence, and, after both victims were killed, the Defendant fled the state with Cobbins and Coleman and hid at Ms. Hays's residence in Lebanon, Kentucky. From there, he monitored the investigation of the homicides until he was apprehended by police. In considering this statute in light of the facts in this particular case, the statute provided sufficient notice for the Defendant to determine that his conduct was proscribed.

As to the Defendant's assertion that the criminal responsibility for conduct of another statute, T.C.A. § 39-11-402, is facially vague because it is indistinguishable from the criminal responsibility for facilitation of a felony statute, T.C.A. § 39-11-403, we do not agree. The criminal responsibility for the conduct of another statute requires that a person has the "intent to promote or assist in the commission of the offense or benefit in the proceeds." The criminal responsibility for facilitation of a felony statute requires only knowledge of another person's intent to commit an offense and not the actual intent to commit the offense. The Sentencing Commission Comments note that this section "recognizes a lesser degree of criminal responsibility." T.C.A. § 39-11-403 (2014).

The Defendant argues that any difference between these two statutes has been abrogated by the sheer breadth of the "natural and probable consequences" rule. In *State v. Richmond*, 90 S.W.3d 648 (Tenn. 2002), our Supreme Court reviewed the history of the natural and probable consequences rule, which we will briefly summarize as it relates to the instant case. Notably:

41

The natural and probable consequences rule arose as a common law component of criminal responsibility and extends criminal liability to the crime intended by a defendant, and collateral crimes committed by a co-defendant, that were the natural and probable consequences of the target crime. *See State v. Carson*, 950 S.W.2d 951 (Tenn. 1997). We have noted on several occasions that "criminal responsibility is not a separate, distinct crime. It is solely a theory by which the State may prove the defendant's guilt of the alleged offense . . . based upon the conduct of another person." *State v. Lemacks*, 996 S.W.2d 166, 170 (Tenn. 1999).

*Richmond*, 90 S.W.3d at 654. In the Criminal Sentencing Reform Act of 1989, the legislature codified the common law doctrine of criminal responsibility, and "the legislature clearly intended that the natural and probable consequences doctrine survive codification." *Id*. at 656 (citing *Carson*, 950 S.W.2d at 955). The Court went on to conclude that "the doctrine remains 'a viable principle underlying criminal responsibility in Tennessee.'" *Id*.

Our Supreme Court in *State v. Howard*, 30 S.W.3d 271 (Tenn. 2000), reiterated that the purpose of the natural and probable consequences rule is to hold aiders and abettors "responsible for the criminal harms they have naturally, probably and foreseeably put into motion." 30 S.W.3d at 276. The court in *Richmond* explained that *Howard* clearly "stands for the proposition that the natural and probable consequences rule is 'an essential element that the State must prove beyond a reasonable doubt' when seeking a conviction based on [a] theory of criminal responsibility." *Richmond*, 90 S.W.3d at 657. The *Richmond* Court outlined the test trial courts are to apply when liability is based upon the natural and probable consequences rule:

> [T]he State must prove beyond a reasonable doubt and the jury must find: "(1) the elements of the crime or crimes that accompanied the target crime; (2) the defendant was criminally responsible pursuant to Tennessee Code Annotated section 39-11-402; and, (3) that the other crimes that were committed were the natural and probable consequences of the target crime."

*Id*. at 656 (quoting *Howard*, 30 S.W.3d at 276).

We conclude that this rule does not abrogate the criminal responsibility statute but, rather, as our Supreme Court has explained, the natural and probable consequences rule is a component of criminal responsibility. Our Supreme Court has affirmed its applicability in criminal law and provided a test for its application. *Richmond*, 90 S.W.3d at 656; *Howard*, 30 S.W.3d at 276. The test requires the State to prove the elements of the crime and criminal responsibility, in addition to proving beyond a reasonable doubt that the other crimes charged

42

were natural and probable consequences of the target crime. We, therefore, can not agree with the Defendant's characterization of this rule as basing a conviction on "foreseeability and negligence." Accordingly, we do not conclude that the statute is unconstitutionally vague. The Defendant is not entitled to relief.

### D. Insufficiency of Indictment

The Defendant argues that because the State pursued the Defendant's convictions under a theory of criminal responsibility, the State was required to include the elements of criminal responsibility in the charging instrument. Therefore, because the State did not do so, the presentment provided constitutionally inadequate notice of the charges against the Defendant. The State responds that the presentment provided adequate notice of the Defendant's charges and that neither state nor federal law requires that the theory of criminal responsibility be charged in the presentment. We agree with the State.

Challenges to the legal sufficiency of an indictment present questions of law subject to *de novo* review on appeal. *See State v. Wilson*, 31 S.W.3d 189, 191 (Tenn. 2000); *State v. Hill*, 954 S.W.2d 725, 727 (Tenn. 1997); *State v. Davis*, 940 S.W.2d 558, 561 (Tenn. 1997). "[T]he Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 9 of the Tennessee Constitution guarantee to the accused the right to be informed of the nature and cause of the accusation." *Hill*, 954 S.W.2d at 727. As a general rule, "an indictment is valid if it provides sufficient information (1) to enable the accused to know the accusation to which answer is required, (2) to furnish the court adequate basis for the entry of a proper judgment, and (3) to protect the accused from double jeopardy." *Id*. (citing *State v. Byrd*, 820 S.W.2d 739, 741 (Tenn. 1991); *VanArsdall v. State*, 919 S.W.2d 626, 630 (Tenn. Crim. App. 1995); *State v. Smith*, 612 S.W.2d 493, 497 (Tenn. Crim. App. 1980)). Tennessee Code Annotated section 40-13-202 provides:

> The indictment must state the facts constituting the offense in ordinary and concise language, without prolixity or repetition, in a manner so as to enable a person of common understanding to know what is intended and with that degree of certainty which will enable the court, on conviction, to pronounce the proper judgment.

T.C.A. § 40-13-202 (2012). "[T]he touchstone for constitutionality is adequate notice to the accused." *Hill*, 954 S.W.2d at 729.

As relevant here, Tennessee Code Annotated section 39-11-402 provides that a person is criminally responsible for the conduct of another if, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense,

the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]" *See* T.C.A. § 39-11-402(2). This statute does not prescribe a separate and distinct crime; instead, it works in synergy with the charged offense to establish a defendant's guilt through the actions of another. *State v. Lemacks*, 996 S.W.2d 166, 170 (Tenn.1999). "An indictment that charges an accused on the principal offense 'carries with it all the nuances of the offense,' including criminal responsibility." *Lemacks*, 996 S.W.2d at 173 (quoting *State v. Lequire*, 634 S.W.2d 608, 615 (Tenn. Crim. App. 1981)). Therefore, the State may proceed under a theory of criminal responsibility even if it is not plead in the indictment or presentment or included in the bill of particulars. *State v. Sherman*, 266 S.W.3d 395, 408 (Tenn. 2008).

Our review of the presentment shows that the Defendant received adequate notice of the charges against him. Each count of the presentment clearly charged the Defendant, along with the co-defendants, with each separate crime committed against C.N. and C.C. Further, the presentment provided the statutory language and citation for the alleged offenses sufficient to notify the Defendant of the allegations and allow entry of an appropriate judgment, in the case of conviction. Based upon the information in the presentment, the Defendant successfully sought dismissal of some of the charges as duplicitous. We also note that the Defendant successfully moved for a bill of particulars, which was the appropriate procedural remedy for acquiring more information regarding the charges against him. *See* Tenn. R. Crim. P. 7(c). As we earlier stated, the law does not require the State to allege criminal responsibility in the indictment, and the Defendant does not identify any resulting prejudice to the Defendant from the absence of the elements of criminal responsibility for the conduct of another in the presentment.

The Defendant acknowledges that Tennessee courts have held that the indictment need not contain language pertaining to criminal responsibility but asserts that this Court has not addressed the issue under the new authority of *Apprendi v. New Jersey*, 530 U.S. 466 (2000). As the Defendant correctly notes, *Apprendi* addressed facts that impact sentencing, which is not at issue here. Further, our Supreme Court has stated that *Apprendi* should not be construed to require certain facts or elements to be pled in a state indictment because *Apprendi* addresses the Sixth Amendment right to a jury trial, not the Fifth Amendment right to a grand jury indictment. *State v. Reid*, 164 S.W.3d 286, 312 (Tenn. 2005); *State v. Berry*, 141 S.W.3d 549, 560 (Tenn. 2004) (quoting *Ring v. Arizona*, 536 U.S. 584, 597 n.4 (2002)). Therefore, in our view the Defendant is not entitled to relief based upon *Apprendi*.

Accordingly, we conclude that the presentments adequately informed the Defendant of the charges against him. The Defendant is not entitled to relief as to this issue.

### E. Application of *Dorantes* Evidentiary Standard

The Defendant asserts that the trial court instructed the jury on the incorrect standard for evaluating circumstantial evidence in violation of the Ex Post Facto Clauses and due process considerations. The trial in this case was held in May 2013; however, the Defendant argues that the alleged crimes occurred in January 2007, before the *Dorantes* opinion and, therefore, the old evidentiary standard for circumstantial evidence should have applied. The State responds that the trial court correctly used the standard adopted in *State v. Dorantes*, 331 S.W.3d 370 (Tenn. 2011). We agree with the State.

Initially, we note that the Ex Post Facto Clause does not by its own terms apply to judicial decisions. *See generally* U.S. Const. Art. 1, §§ 9 and 10; Tenn. Const. Art. I, § 11; *Rogers v. Tennessee*, 532 U.S. 451, 456 (2001). To the extent that due process protects interests similar to those protected by the Ex Post Facto Clauses of the state and federal constitutions, retroactive application of an alteration of a common law doctrine of criminal law violates due process only where the alteration is "unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue." *Rogers*, 532 U.S. at 461.

The pre-*Dorantes* standard for circumstantial evidence, as stated in *State v. Crawford*, required the State to present proof "so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt." 470 S.W.2d 610, 612 (Tenn. 1971). In January 2011, our Supreme Court issued *Dorantes*, which adopted the federal standard that the sufficiency of the evidence standard was the same for circumstantial or direct evidence. 331 S.W.3d at 381. The *Dorantes* court cited a Supreme Court case regarding the standard enunciated in *Crawford* as "confusing and incorrect" to require an additional instruction. *Id*. at 380. The Defendant contends that he should have been afforded the circumstantial evidence rule that was in effect at the time of the commission of the offenses rather than the "effectively lower[]" evidentiary standard of proof. The Tennessee Supreme Court in *Dorantes*, however, noted that "[i]n practice, the distinction between the federal standard and the 'reasonable hypothesis' language used in our state has rarely made a difference," thus providing "little reason to refine" the standard. *Dorantes* 331 S.W.3d at 380.

The State correctly notes that both the Tennessee Supreme Court and this Court began utilizing the same standard for direct and circumstantial evidence shortly after the issuance of *Dorantes* to cases in which the crimes had occurred before January 2011. *See State v. Sisk*, 343 S.W.3d 60, 62 (Tenn. 2011) (crimes committed in 2006); *State v. Parker*, 350 S.W.3d 883, 888, 903 (Tenn. 2011) (crimes committed in 2003); *State v. Martinez*, 372 S.W.3d 598, 601, 604-05 (Tenn. Crim. App. 2011) (crimes committed in 2008).

Accordingly, we conclude that the trial court did not err when it used the evidentiary

standard announced in *Dorantes*. The Defendant is not entitled to relief as to this issue.

## F. Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support his convictions based upon the theory of criminal responsibility. Specifically, the Defendant asserts that the State failed to establish that he intended to aid his co-defendants and benefit from the proceeds of the crimes. The State responds that sufficient evidence was presented for any rational trier of fact to find beyond a reasonable doubt that the Defendant is guilty of the offenses for which he was convicted. We agree with the State.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *Dorantes*, 331 S.W.3d at 379 (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978), superseded by statute on other grounds as stated in *State*

*v. Barone*, 852 S.W.2d 216, 218 (Tenn.1993)) (quotations omitted). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

At trial, the State proceeded under a theory of criminal responsibility to prove the Defendant's guilt of the offenses. The jury was instructed as to criminal responsibility. "A person is criminally responsible as a party to an offense, if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." T.C.A. § 39-11-401(a). Tennessee Code Annotated section 39-11-402(2) provides that a person is criminally responsible for the actions of another when, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense . . . ." The person must "'in some way associate himself with the venture, act with knowledge that an offense is to be committed, and share in the criminal intent of the principal in the first degree.'" *State v. Maxey*, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994) (quoting *Hembree v. State*, 546 S.W.2d 235, 239 (Tenn. Crim. App. 1976)). The defendant's requisite criminal intent may be inferred from his "presence, companionship, and conduct before and after the offense." *State v. McBee*, 644 S.W.2d 425, 428 (Tenn. Crim. App. 1982). A defendant convicted under a criminal responsibility theory "is guilty in the same degree as the principal who committed the crime" and "is considered to be a principal offender." *Id.* at 171. Criminal responsibility is not a separate crime; rather, it is "solely a theory by which the State may prove the defendant's guilt of the alleged offense . . . based upon the conduct of another person." *Lemacks*, 996 S.W.2d at 170. No particular

act need be shown, and the defendant need not have taken a physical part in the crime in order to be held criminally responsible. *Id*.

The Defendant challenges only the sufficiency of the evidence as it relates to criminal responsibility; therefore, we address the State's proof supporting criminal responsibility for the acts. The evidence, viewed in the light most favorable to the State, showed that the Defendant was residing at 2316 Chipman Street before, during, and after these offenses. The Defendant was, at the time of these events and in the years following these offenses, good friends with Cobbins, who was directly connected by DNA evidence to the crimes against C.C. Proof was introduced that the Defendant wrote Cobbins three times during his pre-trial incarceration. In the letters, the Defendant addressed Mr. Cobbins in an affectionate manner, indicating that he was a "brother with love," and promising that the two were "united together forever." He knew Davidson through Cobbins and had stayed at the 2316 Chipman Street residence with Cobbins and Davidson on multiple occasions in December 2006 leading up to these offenses. As we earlier stated, criminal intent may be inferred from his "presence, companionship, and conduct before and after the offense." *See McBee*, 644 S.W.2d at 428.

The evidence further showed that no one in the residence had a vehicle on January 6, 2007, and the Defendant knew of Cobbins and Davidson's plan to carjack someone to obtain a vehicle. The Defendant stated that he saw Cobbins and Davidson return to 2316 Chipman Street in C.C.'s 4Runner. He watched as Davidson and Cobbins took C.C. and C.N., who were both bound and blindfolded, into the residence. The Defendant told detectives that he participated in discussions with Cobbins, Coleman, and Davidson about how to proceed once the car had been stolen and while the victims were confined to the 2316 Chipman Street residence. This is evidence from which the jury could reasonably infer that the Defendant had knowledge of and participated in decisions regarding the ongoing crimes against C.C. and C.N.

After midnight, in the early morning hours of Sunday, January 7, 2007, four black men were seen leaving 2316 Chipman Street and driving around in C.C.'s 4Runner in the Chipman Street area. The Defendant admitted that on Sunday, January 7, 2007, he rode around Knoxville in C.C.'s 4Runner while C.C. was still held captive in the house at 2316 Chipman Street. The Defendant's willingness to make use of the victim's car with full knowledge that C.C. was bound, gagged, and confined to the north bedroom of the house at 2316 Chipman Street is evidence supporting the jury's conclusion that the Defendant acted with knowledge that an offense was being committed and that he shared in the criminal intent of Davidson and Cobbins.

The evidence showed that the Defendant was present in the very small, 805.8 square

foot, residence that had no doors inside, while C.C. was brutally raped and physically abused. The medical testimony showed that C.C. sustained a "tremendous amount" of "severe," "blunt force" injuries during her captivity at 2316 Chipman Street. She was then physically bound into a fetal position so her body could be forced inside a garbage can that was kept in the kitchen adjacent to the living room where the Defendant slept. Ultimately, she suffocated while crammed inside the garbage can mere feet from the living room where the Defendant was seen rolling marijuana on Sunday evening, January 7, 2007. The medical examiner estimated that the victim died sometime between Sunday night, January 7, 2007, and early morning Monday, January 8, 2007.

On Tuesday, January 9, 2007, after C.N.'s body had been found shot and on fire next to the railroad tracks near the Chipman Street residence, Davidson arranged through Vince Wernimont for Cobbins, Coleman, and the Defendant to be driven by Jody Long back to Kentucky, away from the scene of the crime, while Davidson hid in an abandoned house in Knoxville. *See Sotka v. State*, 503 S.W. 2d 212, 221 (Tenn. Crim. App. 1972) ("A defendant's flight and attempts to evade arrest are relevant as circumstances from which, when considered with the other facts and circumstances in evidence, a jury can properly draw an inference of guilty.") Once back in Kentucky, the Defendant, along with Cobbins monitored the investigation of C.C. and C.N.'s homicides via the internet, and the Defendant was seen in possession of "small bullets" consistent with those associated with the crimes in this case.

When taken into custody, the Defendant spoke with the police about the events that occurred at 2316 Chipman Street. His statements were inconsistent and contradictory, not only to his own statements but also to the statements of other witnesses. The jury was entitled to weigh the Defendant's credibility and, in light of the evidence as a whole and the inconsistencies in the Defendant's account of the events, discredit the Defendant's assertion that he was a mere bystander to the horrific acts committed against the victims.

The evidence supports a conclusion that the Defendant knew that Cobbins and Davidson intended to carjack a vehicle, did so, and then kidnapped, raped, and killed the victims. The Defendant's presence and support of the endeavor showed that he furnished substantial assistance in the commission of these felony offenses. The Defendant is not entitled to relief.

### III. Conclusion

Based on the foregoing reasoning and authorities, we affirm the judgments of the trial court.

_____
ROBERT W. WEDEMEYER , JUDGE